Murray COHEN, Plaintiff-Appellant,

v.

Thomas G. AYERS, William O. Beers, Archie R. Boe, Sidney L. Boyar, James W. Button, Alfred I. Davies, Luther H. Foster, Jack F. Kincannon, John G. Lowe, Gordon M. Metcalf, Charles A. Meyer, Aurelio M. Prado, Julius Rosenwald, II, William I. Spencer, Edgar B. Stern, Jr., A. Dean Swift, Edward R. Telling, W. Wallace Tudor, Thomas F. Wands, Arthur M. Wood and Sears, Roebuck & Co., Defendants-Appellees.

No. 78–1620.

United States Court of Appeals, Seventh Circuit.

Argued March 1, 1979.

Decided April 16, 1979.

Rehearing and Rehearing En Banc Denied May 21, 1979.

Bertram Bronzaft, New York City, for plaintiff-appellant.

Burton Y. Weitzenfeld, Chicago, Ill., for defendants-appellees.

Before SWYGERT, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal of a derivative shareholder suit raises numerous issues relating to the legality of several actions taken by the Board of Directors of Sears, Roebuck & Co. with respect to its employee stock-option plan. The plaintiff claims that these actions were void because they did not comply with the shareholder plan authorizing these options and because they constituted waste of corporate assets. Additionally the plaintiff claims that the various proxies mailed to shareholders respecting these actions transgressed the antifraud provisions of section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). The district court granted summary judgment for the defendants, and we affirm.

I

In 1967 the shareholders of Sears, Roebuck and Co., acting on recommendation of the Board of Directors, approved a stock option plan which would authorize the grant of options covering up to 3,000,000 shares of stock to key employees of Sears, including 300,000 shares that could be optioned to Sears directors. The plan provided that the Salary and Supplemental Compensation Committee, a committee made up of non-employee, "disinterested" directors,

would select the employees to receive options and would determine how many options these employees would receive. The exercise price of these options was to be set at the fair market value of the stock on the date the option was granted. Further, the plan specified numerous circumstances under which the options might lapse. For example, qualified options had to be exercised within five years,[1] and a former employee had to exercise his options within three months of leaving the company's employ. Finally, the plan gave the Board broad discretion in the administration of the plan: the Board could re-option "unpurchased shares under expired or terminated options" and could issue such rules and interpretations as "it shall deem necessary or advisable for carrying out the purposes of the Plan." A virtually identical program, the only changes having resulted from new tax provisions relating to options, was approved by the shareholders in 1972 and permitted the grant of options covering up to 4,000,000 shares including 300,000 shares for employee-directors.

After the approval of the 1967 plan, the Board of Directors began to grant stock options to employees designated by the Salary and Supplemental Compensation Committee.[2] The Committee selections for the more than 15,000 key employees as to whom the Committee had little personal knowledge were completely dependent on the recommendations of Sears management. The personnel department developed guidelines for the selection of eligible employees and amounts to be granted. The application of these guidelines, supplemented by the reports of territorial administrative offices, resulted in a final recommendation by the personnel department. This recommendation was then reviewed and approved by

successive levels of the management hierarchy, terminating with the Board of Directors. No such recommendations, however, were made to the Committee with respect to employee-directors. Between 1967 and 1973 the following numbers of options at stated prices were granted: 2,093,016 shares at $56.82 in 1967; 591,612 at $89.82 in 1971; 2,496,194 at $116.44 in 1972; and 7,600 at $101.13 in 1973.

In 1973 the fair market value of Sears stock began to decline. By December of 1973 the price of Sears stock on the New York Stock Exchange was $84.00, causing the 1972 and 1973 options, which were not yet exercisable, to go "underwater." As long as the option price exceeded the market price, which continued to decline and presented little prospect of surpassing the option price, the options were of no present value to the employees. As a result none of these options was ever exercised. To remedy this situation the Committee recommended that the outstanding 1972 and 1973 options be cancelled and that an equivalent number of new options be granted with exercise prices at the currently prevailing fair market price. Thus on January 22, 1974, by action of the Sears Executive Committee, options covering 2,441,910 shares were cancelled, and options covering 2,621,374 shares were granted with an exercise price of $85.94. The value of Sears stock continued to decline, however, and none of these options was exercised either. In September 1974 this cancellation and reissue plan was repeated. The Committee recommended, and the Board adopted and approved, the cancellation of the 1971 and 1974 options and the issuance of options covering 3,489,070 shares at an exercise price of $52.19. Although "key employees"

---

1. *Qualified stock options* are those that meet the requirements of I.R.C. § 422 and thus, despite their compensatory nature, may be eligible for more favorable treatment as long-term capital gain upon disposition. *Non-qualified stock options,* on the other hand, result in taxation when the option is exercised at ordinary income rates on the difference between the option price and the fair market value of the stock.

2. This committee consisted of the following non-employee directors: Homer J. Livingston, Chairman of the Board of the First National Bank of Chicago; J. Roscoe Miller, President of Northwestern University; Edgar G. Burton, Chairman of Simpsons, Ltd.; John D. deButts, Chairman of the Board of A. T. & T.; and Edgar B. Stern, Jr., President of Royal Street Corporation.

received the new options for old options on a one-to-one basis, the employee-directors were granted new options covering only 75 percent of the shares that were covered under the old options. The last options relevant to this litigation were granted in 1975 at $66.57 per share.

In March 1976, the shareholder's derivative action pending before us now was filed in the Southern District of New York.[3] In order to expedite the termination of this action the Board called a special meeting and distributed proxies to shareholders recommending ratification of the directors' actions in cancelling and regranting options. The 1976 proxy statement described and included the text of the 1967 and 1972 plans, gave detailed information regarding employee-director compensation, tabulated the various options cancelled and granted, and contained a copy of the plaintiff's original complaint in this action. Of the 158,-753,361 shares entitled to vote, the resolution ratifying the directors' actions was adopted by a vote of 104,801,263 to 15,854,-918.

The final amended complaint forwarded three grounds for relief. First, the directors' actions were alleged to be in violation of the 1967 and 1972 plans and therefore void. Second, the cancellation and reissue of stock options at lower exercise prices was alleged to be a waste of corporate assets. Finally, the various proxy statements concerning both the original plans and the subsequent 1976 ratification were claimed to violate federal securities laws. The defendants' motion for summary judgment was granted by the district court[4] and this appeal followed.

## II

The plaintiff's first contention is that the two cancellations and subsequent reissues of the cancelled options at lower prices violated the 1967 and 1972 plans. If these reissues did in fact violate the 1967 and 1972 plans, those options would be void under section 505 of the New York Business Corporation Law, which provides:

The issue of such rights or options to directors, officers and employees of the corporation or a subsidiary or affiliate thereof, as an incentive to service or continued service with the corporation, a subsidiary or affiliate thereof, or to a trustee on behalf of such directors, officers and employees, shall be authorized at a meeting of shareholders by the vote of the holders of a majority of all outstanding shares entitled to vote thereon, or authorized by and consistent with a plan which was authorized by such vote of shareholders.

The district court declined to determine whether the reissue violated the plans and held instead that the reissuance was saved from any possible invalidity by subsequent shareholder ratification. We need not decide, however, whether this ratification cured any noncompliance with the plan, since we believe that the reissuance of options did not conflict with the 1967 and 1972 plans.[5]

■■■ The terms of the plans clearly encompass the actions taken in this case. The plans grant the Board the authority to re-option "unpurchased shares under expired or terminated options." Ordinary language makes little distinction between terminate and cancel,[6] and we do not understand why

3. On November 5, 1976, District Judge Wyatt granted the defendants' motion to transfer this action pursuant to 28 U.S.C. § 1404(a) to the Northern District of Illinois.

4. Judge Marshall applied New York law to the common law counts on the ground that the conflict rules of both Illinois and New York apply the law of the state of incorporation to actions concerning the internal affairs of corporations. *See Paulman v. Kritzer,* 74 Ill.App.2d 284, 219 N.E.2d 541 (1966), *aff'd* 38 Ill.2d 101, 230 N.E.2d 262 (1967); N.Y.Bus.Corp.Law

§ 103. As neither party contests this ruling, we will continue to apply New York law where applicable.

5. We will discuss in part III, *infra,* whether this ratification was sufficient to shift the burden of proving waste onto the plaintiff.

6. Webster's Third Edition provides the following relevant definition of "terminate": "to end formally and definitely." This is precisely what the Board did in cancelling the outstanding options.

any technical distinction between the two should be imputed to a provision ratified by shareholders unaware of any such distinction. Thus, the plans clearly permit the Board to re-option cancelled shares.

█ The plaintiff forwards three arguments in support of his contention that "terminated" options are only those options which lapsed due to the death, resignation, retirement or dismissal of an employee but not those that lapsed due to corporate cancellation. First, the plaintiff relies on the absence in the 1967 and 1972 plans of a provision included in the 1962 plan permitting the Board of Directors to lower option prices.[7] We note initially that the Board was not acting under any purported authority to simply lower the exercise price of the outstanding options; it was instead cancelling outstanding options and issuing new options under the plan's provision permitting such a re-option. Furthermore, the plan's provision that the price of the option was to be the fair market value of the stock at the time the option was issued would permit, if not require, the Board to lower the price on the reissued options to the prevailing market price. Accordingly, whatever restriction such an omission placed on the Board's authority to lower prices on outstanding options is not relevant here. Even if it were relevant, we hesitate to attribute any significance to such an omission when the plaintiff is unable to present a scintilla of evidence as to any reason for such an omission.

Second, the plaintiff relies on the affidavit of Arthur M. Wood, a former Chairman of the Board. In that affidavit Mr. Wood states that at no time prior to the 1967 and 1972 plans did the Board discuss the meaning of the "expired or terminated" options provision or permissible Board actions with respect to issued options in the event of a "precipitous" decline in the value of Sears stock.[8] This argument is of merit only if its conclusion is presumed, viz., that "terminated" does not ordinarily connote "cancelled" and would only do so if the Board explicitly expanded its connotation.

Finally, the plaintiff cites several cases presumably supporting a rule of construction that shareholder option plans be construed to permit the lowering of option prices only where such authority is granted in express terms. An examination of these cases, however, does not support such a principle of construction and, if anything, supports the propriety of the cancellation and reissue of options under the plan before us.[9]

7. The plaintiff cites the following provision of the 1962 Sears option plan:

The price per share provided under purchase privileges granted pursuant to this Plan shall be the fair market value thereof on the respective dates on which such privileges are granted, *provided that the Board of Directors may, in its discretion, modify any purchase privilege granted under the Plan for the purpose of reducing the purchase price per share* specified in such purchase privilege to not less than the fair market value per share on the date of such modification, if the aggregate of the monthly average fair market values of the Company's Common Stock for twelve consecutive calendar months before the date of the modification, divided by twelve, is less than 80% of the fair market value of such stock on the date of the original granting of the purchase privilege or of the making of any intervening modification, extension or renewal of the purchase privilege, whichever is the highest.
(Emphasis added).

8. Plaintiff quotes two paragraphs from the Wood affidavit:

4. That at no time prior to the adoption of either resolution or the adoption of either plan did he discuss with any member of the Board informally nor was there any discussion at any Board meeting of the provision incorporated in both plans that "the unpurchased shares under expired or terminated options may again be optioned under the Plan."

5. That at no time prior to the adoption of either resolution or the adoption of either plan did he discuss with any member of the Board informally nor was there any discussion at the Board meeting as to what steps, if any, the Board should recommend or take with respect to outstanding stock options under either plan in the event that there should be a precipitous drop in the price of Sears shares following the grant of options.

9. Two of the cases cited by the plaintiff are of no value in deciding the issue before us. *Michelson v. Duncan*, 386 A.2d 1144 (Del.Ch. 1978), involved a plan that did not contain any

*Jacoby v. Averell,* Fed.Sec.L.Rep. (CCH) ¶ 94,360 (S.D.N.Y.1974), and *Waltzer v. Billera,* Fed.Sec.L.Rep. (CCH) ¶ 94,011 (S.D.N.Y.1973), both cited by the plaintiff, involve virtually identical factual situations. Both cases involved shareholder-approved option plans which provided that any shares subject to an option which "expired" or was "terminated" before exercise would be available for re-options under the plan. In both cases, outstanding options became worthless by virtue of sharp declines in the value of the underlying stock. To remedy this problem the Boards issued "tandem" options: that is, options on the previously optioned shares which were exercisable at the lower price but only after the final exercise date of the prior, high-priced option. These "tandem" options were held to be unauthorized by the plans on the ground that the provision allowing re-option after expiration or termination was exclusive and prevented simultaneous options to be issued on the same shares. The *Waltzer* court, however, explicitly acknowledged that the Board would have had the power to cancel and reissue options under the re-option provision. Fed.Sec.L.Rep. (CCH) ¶ 94,011 at 94,069. Additionally the court in *Jacoby* notes:

> [The defendants assert] that . . . the optionees and Vernando [the corporation] could have agreed to terminate the existing 1968 options and then could have entered into new option agreements. The Court disagrees with the defendants' position that this alternative presented

"purely a matter of form or mechanics—not one of substance."

Fed.Sec.L.Rep. (CCH) ¶ 94,360 at 95,227. The difference relied on by the court was that the termination/reissuance plan would have more restrictive tax consequences than the tandem option plan. Both courts, thus, recognize that provisions identical to the provisions in the two Sears plans permit cancellation and reissue at a lower price.

### III

The plaintiff also charges that the option reissues constituted waste and a gift of corporate assets. The following general principles of law are applicable in deciding issues of waste or corporate gifts. Ordinarily, employee compensation and other corporate payments are not a waste or gift of assets as long as fair consideration is returned to the corporation. The question of the adequacy of consideration is committed to the sound business judgment of the corporation's directors.[10] Thus, a plaintiff attacking a corporate payment has the heavy burden of demonstrating that no reasonable businessman could find that adequate consideration had been supplied for the payment. However, where the directors have a personal interest in the application of the corporate payments, such as where they are fixing their own compensation, the business judgment rule no longer applies and the burden shifts to the directors to demonstrate affirmatively that the transactions were engaged in with good faith and were

---

provision authorizing the reissuance of terminated options, and *Goldsholl v. Shapiro,* 417 F.Supp. 1291 (S.D.N.Y.1976), merely sets aside a derivative suit settlement noting that the underlying issues of the suit, including the validity of the stock option issuance, was to be determined at the trial on the merits.

10. *See, e. g., Beard v. Elster,* 39 Del.Ch. 153, 160 A.2d 731, 738 (1960):

> We think the fact that a disinterested Board of Directors reached this decision by the exercise of its business judgment is entitled to the utmost consideration by the courts in passing upon the results of that decision.
> . . .
> We have before us a plan which, in the judgment of a disinterested Board, is ade-

quately designed to further the corporate purpose of securing the retention of key employees' services. It is theoretically possible, we suppose, that some businessmen could be found who would hold the opinion that options exercisable at once were improvidently granted, but, on the other hand, there are businessmen who would hold a favorable view . . . . We think, therefore, we are precluded from substituting our uninformed opinion for that of experienced business managers of a corporation.

*See also Fogelson v. American Woolen Co.,* 170 F.2d 660, 662 (2d Cir. 1948) (absent any self-interest, judgment of Board as to establishment of employee pension plan would be "conclusive") (dicta).

fair, *i. e.,* that adequate consideration had been supplied.[11] This alteration in the burden and quantum of proof may only be avoided in two circumstances: after full disclosure the payments must have been ratified either by action of disinterested directors or by vote of the shareholders. If the payments are thus ratified, then the business judgment rule is again applicable and the plaintiff can succeed only by meeting the burden applicable to challenges of any corporate transaction.[12] Thus, although shareholders or disinterested directors cannot ratify waste, the existence of such ratification makes proof of waste more difficult.[13]

■ New York law is in accord with these general principles. Under section 713 of the New York Business Corporation Law, an unratified contract in which a di-

rector has an interest is voidable unless the interested directors "shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation . . . ."[14] However, if the transaction is approved by the shareholders or the disinterested directors after the disclosure of all "material facts," the transaction is not voidable for "substantial financial interest alone." Although the statute is not explicit, we interpret these provisions, in accord with the general rule, as shifting the burden of proving the unfairness of the transaction to the challenging shareholder or director, once effective ratification occurs. Thus the act of ratification does not foreclose a finding of waste but it does foreclose the presumption of waste.

This interpretation of the New York statutory language is supported by its legisla-

11. *See, e. g., Kerbs v. California Eastern Airways Inc.,* 33 Del.Ch. 69, 90 A.2d 652 (1952); *Gottlieb v. Heyden Chemical Corp.,* 33 Del.Ch. 82, 90 A.2d 660 (1952).

12. *See,· e. g., Corsicana National Bank v. Johnson,* 251 U.S. 68, 90, 40 S.Ct. 82, 64 L.Ed. 141 (1919); *Alcott v. Heyman,* 42 Del.Ch. 233, 208 A.2d 501 (1965); *Gottlieb v. Heyden Chemical Corp.,* 33 Del.Ch. 82, 90 A.2d 663 (1952).

13. *See Rogers v. Hill,* 289 U.S. 582, 591–92, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933): "If a bonus payment has no relation to the value of services for which it is given, it is in reality a gift in part, and the majority stockholders have no power to give away corporate property against the protest of the minority."

14. The full text of section 713 is as follows:
(a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, or association or other entity in which one or more of its directors are directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone or by reason alone that such director or directors are present at the meeting of the board, or of a committee thereof, which approves such contract or transaction, or that his or their votes are counted for such purpose:
(1) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the board or committee, and the board or committee approves such contract or transaction by a vote sufficient for such purpose without counting the

vote of such interested director or, if the votes of the disinterested directors are insufficient to constitute an act of the board as defined in section 708 (Action by the board), by unanimous vote of the disinterested directors; or
(2) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of such shareholders.
(b) If such good faith disclosure of the material facts as to the director's interest in the contract or transaction and as to any such common directorship, officership or financial interest is made to the directors or shareholders, or known to the board or committee or shareholders approving such contract or transaction, as provided in paragraph (a), the contract or transaction may not be avoided by the corporation for the reasons set forth in paragraph (a). If there was no such disclosure or knowledge, or if the vote of such interested director was necessary for the approval of such contract or transaction at a meeting of the board or committee at which it was approved, the corporation may void the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board, a committee or the shareholders.
N.Y.Bus.Corp.Law § 713 (McKinney Supp. 1977).

tive history. New York's section 713 is based on section 820 of the California Corporation Code. The original version of section 713, and the current California version, provided that an interested transaction was not voidable either if properly ratified, or if fair and reasonable. The New York legislature later amended section 713. The provision of section 713, which stated that an interested contract was voidable if unfair, was relocated. Thus in contrast to the original version, the statute provides that the transaction is not voidable if ratified properly, but if not so ratified the transaction is voidable unless the interested directors affirmatively establish that the transaction was fair and reasonable. This amendment was conceded by the revisors to be non-substantive and simply of a clarifying nature:

> The change is designed to make clear that the principal function of this section is to allocate the burden of proof as to the voidability of a transaction between an interested director and his corporation.
>
> . . .

Legislative Committee to Study Revision of Corporation Laws, 15th Interim Report 33 (1971). Thus it is clear that New York follows the general law we have set out concerning conflict of interest transactions, *viz.,* that the transactions must be fair but that ratification shifts the burden of proving unfairness onto the contesting shareholders.[15]

■ Applying these principles, summary judgment against the plaintiff was appropriate. Although some of the directors had an interest in the option reissues, the transactions were effectively ratified by the shareholders.[16] The plaintiff, if he is to prevail, must therefore demonstrate that these transactions were unfair. Examining the record in this case, we find that the plaintiff failed to produce *any* evidence suggesting that the price reduction was unreasonable and thereby failed to create any material issue of fact on this question. Indeed, it appears that the plaintiff is proceeding on the theory that a reduction in option prices alone raises a material issue of fact as to whether the transactions constituted waste. *See* Brief for Plaintiff at 39.

Consideration of the economics of these option reductions confirms that corporate waste cannot be inferred here. The possibility of waste arises only when the corporation gives something of value to another without adequate consideration. Although the value of an employee stock option cannot be determined precisely,[17] its principal value derives from the possibility, whether present or future, that the option holder will be able to purchase the underlying stock at a price below market. The first

---

**15.** Admittedly the statute is ambiguous as to the application of any fairness test after full disclosure and ratification and could be read to validate any properly ratified transaction irrespective of its unfairness. See Weiss, *Business Associations and Securities Regulations,* 23 Syracuse L.Rev. 331, 334 (1972). Case law prior to section 713 considered the fairness of interested director transactions even after ratification. *See, e. g., Wineburgh v. Seeman Bros.,* 21 N.Y.S.2d 180 (Sup.Ct.1940) (reasonableness of directors' salaries). Furthermore, the statutory language "by reason *alone* of the director's interest" suggests that all other grounds for attacking the transaction remain available, particularly given that in New York at one time transactions had been voidable by reason of interest alone. *See Munson v. Syracuse, Geneva & Corning R.R.,* 103 N.Y. 58, 8 N.E. 355 (1886). Thus, most commentators have construed § 713 as providing only a first line of defense. *See* Comment, *"Interested Director's" Contracts—Section 713 of the New York Business Corporation Law and the Fair-*

*ness Test,* 41 Fordham L.Rev. 639, 648 n. 75 (1973); C. Israels, Corporate Practice § 9.19, at 296 (2d ed. 1969); M. Fogelman, McKinney's Forms—Business Corporation Law 154 (Supp. 1977). At least one case of the New York Court of Appeals tends to confirm this view. *See generally Rapoport v. Schneider,* 29 N.Y.2d 396, 402–03, 328 N.Y.S.2d 431, 437–38, 278 N.E.2d 642 (1972) (liability for waste still exists even after ratification by disinterested directors).

**16.** As to the effectiveness of the disclosures in this case, see part IV *infra,* particularly note 21.

**17.** This problem principally results from the numerous restrictions placed on employee stock options: they are nontransferable and their exercise is contingent on continued employment with the firm granting the option. *See* Dean, *Employee Stock Options,* 66 Harv.L. Rev. 1403, 1422–27 (1953).

and most obvious element of value that a stock option might have is the differential between the option price and the market price of the underlying security. Thus, an option to buy stock for $20 that is currently selling for $25 has some value by virtue of the $5 differential that can be realized by exercising the option. The second element of value is the potential appreciation of the price of the underlying security during the exercise period, thereby increasing the ultimate differential at exercise. For example, the Wall Street Journal reported that on March 22 on the Chicago Options Exchange call options on Sears stock (exercisable until June) were traded at the following prices: call options at $20 were traded at $1\%_{16}$ and call options at $25$ were traded at $\%_{16}$. On the same day the closing price for Sears stock was $20\%_8$. Thus, although the differential for the $20 call was only $\%_8$, the cost of the option was $1\%_{16}$. Likewise for the $25 option which was "underwater" and had no differential the option price was $\%_{16}$. This additional increment, often referred to as the "premium," reflects the value to the investor of possibly realizing gains from rise in Sears stock before June.

Applying these principles, it is clear that when a corporation reduces the option price on stock with a constantly rising value, the value of the option, both in terms of its current differential as well as its range of potential appreciation, is increased. Therefore, the possibility of waste—giving added value without any consideration—is clearly present. However, where the price of stock is declining, a reduction in the option price does not necessarily confer added value to the option recipients. For example, if the option price is lowered to meet the fair market value of the stock (but no lower) the value of the option will not have increased if the potential range of appreciation has decreased along with the fair market value. This would probably be the case in most instances of stock value decline. Of course, even if some increased value has accrued to the option in these situations, waste would still not be present if that increase were premised on adequate consideration in terms of future services of the employees. Thus, a contesting shareholder with the burden of proving waste cannot discharge that burden merely by demonstrating a reduction in option prices alone.[18]

This analysis finds explicit support in a New York case virtually identical to the case before us. In *Amdur v. Meyer*, 15 A.D.2d 425, 224 N.Y.S.2d 440 (Sup.Ct. 1962), a stockholder's derivative action was brought challenging reductions made in the prices of stock options that had been granted to directors, officers and employees of the corporation. The option prices had been decreased to reflect a drop in the value of the underlying stock caused by the issuance of stock dividends. Subsequently, the Board sought and obtained shareholder ratification of the price reduction after making a full disclosure of the relevant facts. The court held that the "business judgment" rule was applicable and placed the burden of proving waste on the shareholder.[19] The court granted summary judgment on behalf of the defendants and stated:

> The outstanding shares of common stock by the declaration of these stock dividends had been increased from 715,145 to 758,696 with a resulting dilution in the benefits intended to be conferred upon the optionees. The directors, with the general power to do any act which fell within what properly might be regarded as the management of the ordinary busi-

---

**18.** We emphasize that the result would be different were the burden on directors to demonstrate the reasonableness of the transaction as it is in *unratified* interested director transactions. In those cases, the director must affirmatively demonstrate either that the price reduction entailed no value increase or that any increase was in consideration of future services to the corporation.

**19.** The court did not explicitly detail its reasons for placing the burden on the shareholder, but given that the facts indicate that some directors were optionees it is more reasonable to assume that ratification was the decisive factor (as opposed to assuming that the court would always place such a burden on the shareholder even in interested director transactions).

ness of the corporation, by their resolution in substance said that in light of subsequent events the basic agreements did not convey the benefits the directors had originally intended to confer.

224 N.Y.S.2d at 443. Thus, as in this case, the reduction of an option price to meet declining stock value is not waste per se and in fact may well be necessary to maintain the value of the originally conferred benefits. Contesting shareholders, in order to overturn the ratified discretion of directors, must therefore present sufficient additional evidence that price reductions did more than maintain the intended value of the options. Since plaintiff has offered no evidence suggesting any such abuse and has premised his case on the price reduction alone, we hold that summary judgment on this issue was appropriate.[20]

**20.** *Accord Michelson v. Duncan,* 386 A.2d 1144, 1152 (Del.Ch.1978) ("decreasing the price of options is not ipso facto a waste of corporate assets"). The plaintiff relies on *Udoff v. Zipf,* 44 N.Y.2d 117, 404 N.Y.S.2d 332, 375 N.E.2d 392 (1978), as allegedly supporting the proposition that summary judgment is not an appropriate method to resolve whether option price reductions constitute waste. Notwithstanding that this is a procedural question on which federal law controls and that *Udoff* is only a New York court's interpretation of New Jersey law, we find *Udoff* to be otherwise distinguishable. The court there emphasized that the plaintiff had not been granted any pre-trial discovery, whereas here the plaintiff has engaged in extensive pre-trial discovery. Although plaintiff claims that this discovery was inadequate, the issue of adequacy of discovery before summary judgment is committed to the discretion of the trial court. We cannot say in the facts of this case, particularly given that plaintiff had more than one year to conduct discovery, that discretion was abused. *See generally Patterson v. Stovall,* 528 F.2d 108, 113 (7th Cir. 1976).

**21.** Before the district court the plaintiff argued the proxy statements distributed in 1974, 1975 and 1976 relating to the election of directors failed to adequately reveal their interest and participation in the option schemes and thereby violated § 14(a). The district court found that sufficient disclosures were in fact made when the 1974, 1975 and 1976 statements were read in conjunction with one another and with accompanying annual reports. The plaintiff has abandoned this issue on appeal. To complicate matters further, the district court interpreted the issues relating to the 1976 proxy for the

## IV

■ The plaintiff's final claims allege that the three proxy statements involved in this case (the two proxy statements preceding the 1967 and 1972 option plan approvals and the proxy statement preceding the 1976 ratification of the option reissuance) failed to comply with federal securities anti-fraud provisions, particularly section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a).[21] The common element of each of these claims is that the proxy statements either misrepresented certain material facts or failed to disclose other material facts necessary to prevent the proxy statements from being misleading.[22] We will address each of the alleged material misrepresentations or omissions in turn.

■ A number of the alleged deficiencies in the 1976 ratification proxy statement special ratification meeting as raising questions only as to the adequacy of ratification under the New York Corporation Law and not as to compliance with federal anti-fraud requirements. The plaintiff claims now that he was arguing that these 1976 special meeting proxy deficiencies also violated federal law. However, he does not in his brief before this court raise these nondisclosure and misrepresentation issues in relation to the validity or ratification under New York law. Our holding, however, is the same for both issues since we do not see any practical difference between the obligation of "good faith disclosure of the material facts" imposed by § 713 of the New York Business Corporation Law (McKinney Supp. 1977) as a prerequisite to valid ratification of conflict transactions and the obligations imposed by § 14 of the 1934 Act.

**22.** The text of Rule 14a–9, 17 C.F.R. § 240.-14a–9 relied on by plaintiff is as follows:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

would only be of significance if the plaintiff's interpretation of the 1967 and 1972 plans was correct, *viz.*, that the authority to reissue terminated or expired options did not encompass authority to reissue cancelled options. Thus, the plaintiff first alleges that the proxy statement was misleading insofar as it stated that the Board interpreted "termination" to include "cancellation" even though the Board had not considered this issue when the plans had been adopted. Second, the plaintiff claims that the proxy statement was materially misleading through its failure to mention the omission of the provision in the 1962 plan which had permitted price adjustments. Third, the plaintiff argues that the proxy was misleading in that it failed to state that the 1967 and 1972 plans could not be amended without shareholder approval. Fourth, there was no disclosure that Sears had never before cancelled and reissued options since 1952 even when granted employee options were underwater.

We do not find these omissions to be material. To begin with, the 1976 ratification is best understood as an approval of the directors' actions notwithstanding the 1967 and 1972 plans, so that the actual meaning of those plans was irrelevant. But even if one accepts the unlikely proposition that the 1976 ratification sought only the ratification of an interpretation of the 1967 and 1972 plans, we still do not find these omissions to be material. We have already, in construing the 1967 and 1972 plans, rejected the plaintiff's arguments that first the Board's failure to consider expressly whether termination included cancellation and second the plan's omission of an earlier price reduction provision were relevant to the interpretation of the disputed term.

Similarly, we do not feel that the fact that Sears had not used this procedure at least since 1952 has any bearing on whether "termination" under the 1967 and 1972 plans encompassed "cancellation." Finally, since we have held that the plan permitted the actions here, there was no "amendment" of the plan by the directors, and thus the non-disclosure of amendment procedures was not material.

■ The remainder of the plaintiff's attacks on the 1976 proxy statement relate to alleged non-disclosures of the interest and involvement of directors in the cancellation plans. First, the plaintiff alleges that the statement was misleading in failing to disclose that six out of the nine directors who approved the first cancellation were interested beneficiaries of that action. However, the proxy statement did specifically list each director who received options and the number of options held by each such director. This listing thus revealed that a substantial number of the directors were interested in the stock option plans. We do not believe that it would have been material to voting shareholders to identify the exact percentages or numbers of interested directors engaging in the approval of each cancellation plan as long as the shareholders had been told, as they were, the extent of self-interest among the directors.[23] In addition, the complaint in this action was appended to the proxy statement, and the complaint clearly states in two places that a majority of the Board was interested in the option reissues.

■ The plaintiff next cites the failure of the proxy statement to state that the Compensation Committee did not operate independently. This omission would be material only insofar as it related to the inde-

---

23. See *Ash v. LFE Corp.*, 525 F.2d 215 (3d Cir. 1975). There the court held that an annual meeting proxy statement recommending, *inter alia*, approval of a pension plan was not materially deficient in violation of Rule 14a-9 for its failure to detail the participation of interested, beneficiary directors in the development of the plan. The interest of the directors in the proposal was revealed by the section of the proxy statement detailing their remuneration, and as the court pointed out, "any rational stockhold-er must have known that the corporate management had a hand in [the plan's] preparation." *Id.* at 218. Similarly, the proxy statement here revealed the number of interested directors and the extent of their interest and it must be presumed that rational stockholders would assume that these interested directors participated in the disputed decisions; in that light, the exact number of voting directors becomes immaterial.

pendence of the committee vis-à-vis the director-beneficiaries of the option plans, and as to this matter the district court found that the Committee did operate independently on the basis of its personal knowledge of the director-beneficiaries. Thus, a statement of the Committee's dependence, if made, would have been false and therefore certainly not required by section 14.[24] The plaintiff does not bring to our attention any reason why the district court's finding was clearly erroneous, and thus we decline to upset it.

The plaintiff's attacks on the proxy statements leading to the adoption of the 1967 and 1972 option plans, like some of his attacks on the 1976 ratification statement, all depend on the plaintiff's erroneous construction of the termination provision of those plans. Specifically the plaintiff contends that the statements omitted the following material facts: that the Board reserved the power to grant options at lower prices to replace previously granted options; that the Board reserved the power to grant new options to purchase shares covered by higher-priced options which had neither "terminated" nor "expired"; that the Board reserved the power to grant options to purchase 300,000 shares, an amount in excess of the stated maximum; that the Board reserved the power to grant replacement options thereby in effect extending the exercise power beyond its stated term; and that the Board reserved the power to amend the plan without shareholder approval. We have already held that the term "termination" would connote, in the ordinary sense of language employed by stockholders, any formal or definite ending of the option, including cancellation by action of the Board. Thus, the Board did not have any authorization for, and did not in fact do anything resulting in, the granting of options on shares for which options had not terminated, the issuance of more options than authorized by the plan, the extension of exercise periods or the amendment of the plans. Likewise, since the plain meaning of the terms of the plan encompassed the actions taken here, there was no need for the Board to state that "termination" referred *inter alia* to cancellation by Board action.

The judgment of the District Court is Affirmed.

---

**24.** Not only did the Board have no obligation to disclose that the Committee was not completely independent, but also it had no obligation to disclose even that the independence of the Committee might be a matter of dispute. The following section of the Supreme Court's opinion in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2120, 48 L.Ed.2d 757 (1976) is controlling:

> Nor can we say that it was materially misleading as a matter of law for TSC and National to have omitted reference to SEC filings indicating that National "may be deemed to be a parent of TSC." As we have already noted, both the District Court and the Court of Appeals concluded, in denying summary judgment on the Rule 14a–3 claim, that there was a genuine issue of fact as to whether National actually controlled TSC at the time of the proxy solicitation. We must as-

sume for present purposes, then, that National did not control TSC. On that assumption, TSC and National obviously had no duty to state without qualification that control did exist. If the proxy statements were to disclose the conclusory statements in the SEC filings that National "may be deemed to be a parent of TSC," then it would have been appropriate, if not necessary, for the statement to have included a disclaimer of National control over TSC or a disclaimer of knowledge as to whether National controlled TSC. The net contribution of including the contents of the SEC filings accompanied by such disclaimers is not of such obvious significance, in view of the other facts contained in the proxy statement, that their exclusion renders the statement materially misleading as a matter of law.

*Id.* at 453, 96 S.Ct. at 2134 (footnotes omitted).