**BIO–MEDICUS, INC., a Minnesota Corporation, Harold D. Kletschka and Edson Howard Rafferty, Appellants,**

v.

**SHAREHOLDERS COMMITTEE IN OPPOSITION TO the MANAGEMENT OF BIO–MEDICUS, INC., Fran Aberle, Miles Burd, Earl Grundei, Sam Lykken, Harry Malm, Harry Olson, Roger Pitsenbarger, Melvin Skarphol, and Herman Lee, Appellees.**

Nos. 78–1422, 78–1430, 78–1511, 78–1582, 79–1406, 79–1456 and 79–1739.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1979.

Decided Nov. 13, 1979.

Richard L. Post, O'Connor & Hannan, Minneapolis, Minn. (argued), John Remington Graham of Milloy & Graham, Brainerd, Minn., on brief for appellants.

Joseph W. Anthony, Larkin, Hoffman, Daly & Lindgren, Ltd., Minneapolis, Minn., for appellees.

Before STEPHENSON and McMILLI-AN, Circuit Judges, and HANSON,[*] Senior District Judge.

HANSON, Senior District Judge.

These consolidated appeals, interlocutory in character, are from four separate orders by two different judges[1] denying three of plaintiffs' motions for preliminary injunctive relief in the above-styled case. Because we find no abuse of discretion in connection with the denial of any of the motions, we affirm in each instance.

## I.

The case arose out of a 1977 contest for control of Bio-Medicus, Inc., a publicly-held Minnesota corporation. Plaintiffs Kletschka and Rafferty founded the company in 1970 and since then had served on its board of directors and as its chief executive officers. The defendant Shareholders Committee, composed of the individual defendants, was formed on June 29, 1977, for the pur-

pose of initiating the proxy contest already mentioned. Without going into great detail, we note that the members of the Shareholders Committee were unhappy with Kletschka and Rafferty's management of the company; with their resistance to bringing in outside managerial talent (and Kletschka's alleged threat to bankrupt the company if this were attempted); and with their hotly-disputed claim that the board of directors had authorized them, at a December 1976 meeting, to convert their past-due salaries to shares of Bio-Medicus at the rate of $.01 a share. Payment of the back salaries at this conversion rate would have given Kletschka and Rafferty some 70% of the shares in the corporation.

The proxy contest was waged during July and August, 1977. This suit was filed on August 22, 1977, seven days before the annual meeting of the Bio-Medicus shareholders scheduled for August 29. In the complaint and by separate motions filed the same day and again four days later, plaintiffs alleged that defendants' proxy materials were false and misleading in numerous respects, in violation of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and regulations thereunder,[2] and sought among other things to have the district court enjoin defendants' use of the materials, the holding of the annual meeting, or the voting of any proxies defendants had solicited if the meeting was held. The court did not issue any of these requested injunctions, but did postpone the annual meeting until September 7, 1977. It is not clear from the record before us whether the district court ever made an explicit ruling on the motions for injunctive relief just mentioned; in any case no appeal was taken from the court's failure to grant them.

At the annual meeting held on September 7, 1977, the Shareholders Committee was

[*] The Honorable William C. Hanson, Senior United States District Judge, Southern District of Iowa, sitting by designation.

1. The Honorable Miles W. Lord, United States District Judge for the District of Minnesota, presided over the case from its inception until April 30, 1979; the case was subsequently as-

signed to the Honorable Edward J. Devitt, Chief Judge, United States District Court for the District of Minnesota.

2. Additional violations were alleged by later amendment of the complaint.

able to elect its slate of directors. A local bank served as judge of the election, and certified the results of its tabulation of the votes on September 14, 1977. After the election the new board took control of the company, although not without some difficulty. Kletschka and Rafferty refused to recognize the validity of the election, and during the next two months they continued in various ways to try to assert authority as directors and officers of the company, despite instructions to the contrary from the new board. The new board finally suspended them from their executive offices without pay on November 14, 1977; and on November 21, 1977, plaintiffs made the first and most important of the motions with which we are here concerned, moving the court to

> enjoin the Defendants . . . by Preliminary Injunction, from anywise interferring with [Kletschka and Rafferty's] duties . . . to [Bio-Medicus] as officers, directors, and employees thereof . . . so as to preserve the status quo pending further proceedings herein.

Without ruling on this motion, the district court arranged a temporary truce between the parties that allowed the new board to retain control of the company and stopped Kletschka and Rafferty from holding themselves out as officers and directors, but required the new board to pay Kletschka and Rafferty certain amounts as salaries; and on November 30, 1977 the court referred the case to a Special Master,[3] who was empowered to hold hearings and directed to issue a report and recommended disposition of pending matters.

Pursuant to this order, the Master held 13 days of formal hearings during which 15 witnesses testified and 174 exhibits were received. On March 14, 1978, the Master issued his lengthy final report and recommendations. The principal matter dealt with in the report was plaintiffs' November 21, 1977 motion for a preliminary injunction. Applying both the tests set forth in *Fennell v. Butler*, 570 F.2d 263 (8th Cir.), cert. denied, 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978), to the factual and legal situation as he found it to be, the Master concluded that plaintiffs' motion should be denied, on the ground that they had met neither branch of either *Fennell* test. On April 20, 1978, the district court adopted the Master's report and denied plaintiffs' November 21, 1977 motion. The first two of these appeals ensued.[4]

While those appeals were pending, the time came for the 1978 annual meeting of the Bio-Medicus shareholders. Plaintiffs made a motion in the district court for a preliminary injunction against the convening of this meeting, the solicitation of proxies, or the voting of proxies or shares. The motion was set for hearing before the Magistrate,[5] who concluded that plaintiffs had demonstrated neither irreparable injury nor a balance of hardships tipping decidedly in their favor if the meeting was allowed to go on as planned, and recommended that their motion be denied. This was done by order dated June 27, 1978, and plaintiffs again appealed. At the 1978 meeting, defendants' slate of directors, which was not opposed by plaintiffs, was again elected to office.

The four appeals taken as of the summer of 1978 were consolidated for briefing and argument. In their brief plaintiffs pointed out that prior to adopting the report of the Master in its April 20, 1978 order, the district court had neither obtained a transcript of the proceedings before the Master nor held a hearing on plaintiffs' objections to the report. On motion of defendants, this Court remanded the case to the district court for further consideration of the Master's report pursuant to Rule 53(e)(1) and (2), F.R.Civ.P.[6] The district court held an

---

3. Mr. C. Blaine Harstad.

4. There were two appeals from the one order because the corporate plaintiff (brought into the suit by the "old board") appealed separately from the individual plaintiffs. This is true of each order appealed from except the last.

5. The Honorable Patrick J. McNulty, United States Magistrate, District of Minnesota.

6. Rule 53(e)(1), F.R.Civ.P., provides that "unless otherwise directed by the order of reference," the master shall file with the clerk of the district court "a transcript of the proceedings

initial hearing on February 1, 1979; the parties waived oral argument and agreed to file briefs; and transcripts were made available. On April 30, 1979, the district court in effect reissued its order of April 20, 1978, again adopting the Master's report and denying plaintiffs' November 21, 1977 motion for a preliminary injunction. Plaintiffs again appealed. On April 30, 1979, the judge who had until then been handling the case, Judge Lord, also recused himself from further involvement with the case.

While the quickly-multiplying appeals were again pending before this Court, the time came for the 1979 annual meeting of the Bio-Medicus shareholders. As before, plaintiffs applied to the district court for an injunction against the convening of this meeting, the soliciting of proxies or the voting of proxies or shares, and their motion was again denied (by order dated August 17, 1979) on the ground that they had demonstrated neither irreparable injury nor a balance of hardships tipping decidedly in their favor. The final appeal now before us was taken from that order.[7] The parties indicated during oral argument before this Court that at the 1979 annual meeting a new board was elected to office. We gather that Kletschka and Rafferty did not run in the election.

## II.

We consider first the appeals from the two orders denying plaintiffs' November 21, 1977 motion for an injunction whose effect would have been to put them back into power pending a determination on the merits of their underlying claims against defendants. Both orders are founded on the Master's report of March 14, 1978, which was adopted by the district court in each instance. Our review has therefore been concentrated mainly on the findings and conclusions of the Master, although of course it is the actions of the court that are directly in question. We are mindful of the rules that

> [t]he grant or denial of a preliminary injunction may . . . be reversed only if the lower court abused its discretion or based its decision upon an erroneous legal premise[,]

*Fennell v. Butler, supra* at 264, and that findings of fact by the district court—here, as set forth by the Master—will not be set aside unless clearly erroneous. Rule 52(a), F.R.Civ.P.

### A.  *The Master's Report.*

Plaintiffs' basic claim throughout this litigation has been that the September 7, 1977 election was invalid because of the numerous violations of the Securities Exchange Act of 1934, and regulations thereunder, allegedly committed by defendants prior to the election. They have also claimed that neither slate of directors was elected on September 7, because no "Certificate of Election" was issued by the judge of the election, and that they were therefore entitled to hold over in office pending issuance of such a "Certificate." In his report, the Master considered plaintiffs' claims in detail, and found in each case that they had not demonstrated a probability of success on the merits or raised a sufficiently serious question going to the merits to make it a

and of the evidence and the original exhibits." Rule 53(e)(2) provides that the court "after hearing may adopt the [master's] report . . ." In this case, although the order of reference did not excuse the Master from filing a transcript of the proceedings before him, he was excused from filing a transcript by an order of the district court dated January 30, 1978, on the ground that the cost of such a transcript would be excessively burdensome to the parties. The Master did file all the original exhibits. Further, although no hearing was held on plaintiffs' objections to the Master's report prior to the district court's April 20, 1978 order, these objections were filed and reviewed. *See* the Order Based Upon the Recommendation and Final Report of Special Master C. Blaine Harstad, Appendix at 43–44.

7. The parties agreed to submit the issues raised by this latest appeal on the record and briefs on file with this Court as of September 12, 1979 and on the argument had before us on that date. Supplemental Appendix II contains a full record of the proceedings before Judge Devitt in connection with plaintiffs' motion to enjoin the 1979 annual meeting.

fair ground for litigation.[8] The Master also found that plaintiffs had failed to demonstrate the sort of irreparable harm or balance of hardships to the *shareholders* of Bio-Medicus that would be required to justify the injunctive relief sought, *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); and finally, he found that in any case plaintiffs had unclean hands in the matter, and failed to qualify for equitable relief for that reason as well.

We have carefully reviewed the Master's findings and conclusions, and plaintiffs' objections thereto, and find no fault with the Master. By and large, plaintiffs' objections are aimed at the Master's findings of fact. In each instance, there is substantial evidence in the record that supports the Master, and we are nowhere left with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Nor can we find that the Master based his conclusions and recommendations upon erroneous legal premises.

We discuss in detail only one of plaintiffs' claims: that newly-discovered evidence demonstrates the "clear error" of the Master's conclusions about whether defendants intended or had agreed before the September 7, 1977 election to oust Kletschka and Rafferty from their positions as officers of the corporation should defendants win the election.

To begin with, we have examined the parts of the record cited in the briefs as bearing on this question, including the testimony about the long-standing desire of various persons to bring in outside managerial talent and to reduce the management responsibilities of Kletschka and Rafferty; the position of the "Saxxon group" that Kletschka and Rafferty should be removed from their managerial positions entirely; the statements made by representatives of

defendants in connection with their solicitation of proxies just prior to the September 7 election; and the Burd-Aberle complaint filed in the state court on July 7, 1977. All of this evidence was before the Master when he made his report, and we find that there is ample basis in it to support the following passage from the report:

(5) *Intention to Oust Kletschka and Rafferty*

Plaintiffs claim it was false, misleading and material for the Defendants to omit from their proxy material their intention to oust Kletschka and Rafferty from their positions as . . . officers. As to that claim, I reach the following Conclusions:

(a) That Defendants did not have an agreement amongst themselves or an intention as to what roles Kletschka and Rafferty would play with the company if the "new board" was elected. The Defendants knew that [they] wanted the company to have a new business-type manager—but they did not know whether this would require the release of Kletschka and Rafferty from their positions as officers. The "new board" did not know how Kletschka and Rafferty would respond to control by the "new board."

.    .    .    .    .

(c) That the omission of this issue from the Defendants' proxy statement does not make the proxy material false and misleading.

(d) That Kletschka and Rafferty were not suspended until November 14, 1977, more than two months after Defendants won the election; that Kletschka and Rafferty's suspension followed the lockout of the company's employees on September 27, 1977, and the mailing of letters to several banking institutions by Kletschka and Rafferty, all dated October 12, 1977, which informed the banking institutions that all checks drawn on Bio-

---

8. There is one exception to this statement: on one issue the defendants virtually conceded that they had violated a provision of the securities regulations; but the Master concluded that

"[t]he relief Plaintiffs seek [having the election declared invalid] is too drastic for the violation."

Medicus accounts required the signature of either Kletschka or Rafferty . . ., that this action effectively froze all company accounts and rendered the transaction of further business difficult.

.  .  .  .  .

(h) That Plaintiffs are unlikely to be able to prevail on these issues at the time of trial, and these issues are not a fair ground for litigation.

The new evidence relied on by plaintiffs shows that the new board held a meeting on September 7, 1977, the very day of the election, and passed resolutions as follows:

RESOLVED, that Messrs. Kletschka and Rafferty be suspended in their capacity as president and vice president of the corporation until such time as the corporation has had an opportunity to review the employment contracts of each.

FURTHER RESOLVED, that the company will determine if there has been a breach of those employment contracts by either Messrs. Kletschka or Rafferty.

FURTHER RESOLVED, if there is a breach of those contracts, the company would act to terminate the same.

Plaintiffs argue that these resolutions, which were unknown to themselves or the Master when the latter made his report, demonstrate the "clear error" of the Master's conclusions as set forth above. We do not agree.

The September 7 resolutions of the new board simply do not demonstrate any pre-election agreement among the defendants that Kletschka and Rafferty would be removed from their executive offices if defendants won the election. They demonstrate at most an agreement on September 7 that Kletschka and Rafferty would be ousted *if* they were found to have breached their employment contracts. Further, in view of the fact that the September 7 "suspension" was never communicated to Kletschka and Rafferty, it may be inferred that the new board may have had some doubts either about the validity of the resolution (since the polls had not closed and the

votes had not been tabulated when the new board met on September 7) or about its wisdom. This consideration takes on added significance in view of a September 17 resolution adopted by the new board and communicated to Kletschka and Rafferty by letter from defendants' counsel on September 19. The September 17 resolution, which was in evidence before the Master, provided that

Dr. Harold Kletschka and Mr. Edson Rafferty *be retained as president and vice president/secretary*, respectively, of the corporation but they be *temporarily relieved* of all duties and powers except as provided for herein. . . .

(emphasis added). This resolution supports the Master's conclusion that before November 14 the new board had not agreed that Kletschka and Rafferty would have to be removed from their executive positions with the company. The September 7 "suspension," whatever its validity, is consistent with the testimony of a member of the new board that although there had been discussion in certain quarters about replacing Kletschka and Rafferty with other officers, there was no agreement that this would have to be done;[9] with the September 17 resolution retaining Kletschka and Rafferty as president and vice president but temporarily relieving them of all duties and powers; and with the Master's conclusion that it was not until November 14, after the two months of "serious misconduct" described by the Master, that the new board concluded that Kletschka and Rafferty were not going to respond satisfactorily to control by the new board and would have to be removed from office. No error appears in the conclusions of the Master at this point, even taking the new evidence into consideration.

The objection to the Master's report that we have just discussed is typical of most of plaintiffs' other objections: it is highly fact-specific, and it depends for its validity on the assumption that various ambiguities or conflicts in the evidence are to be resolved in favor of plaintiffs, rather than against them. It would serve no useful

9. See Tr. G, 75–93 (testimony of Herman Lee).

purpose for us to discuss the other objections in any detail. The resolution of these questions, given the posture of the case, was for the Master, subject to limited review by the district court and by ourselves. Upon such review, we are satisfied that there is no clear error. Plaintiffs will still have the opportunity to try to prove their case at trial.

### B. *The District Court's Adoptions of the Master's Report.*

Plaintiffs have suggested that in view of certain actions of Judge Lord, including his adoption of the Master's report on two occasions without opinion, his unwillingness to delay his April 30, 1979 ruling pending further settlement negotiations, and his recusal of himself immediately after issuing the April 30, 1979 order, Judge Lord may either have abused his discretion or exercised "no discretion" in denying their application for injunctive relief. Plaintiffs suggest that it would be appropriate for this Court to "study in depth the record on appeal" and ourselves grant the injunction they seek, or else to remand the case to the district court for reconsideration of the whole matter by the new judge assigned to the case, Judge Devitt. We limit ourselves to the following comments on these suggestions.

■ First, when the first four appeals were remanded for further consideration by the district court of the Master's report, Judge Lord informed plaintiffs that "we're just going to take the time to go through this very thoroughly, page by page, and look at every objection you will have . . . ." Three months later Judge Lord readopted the Master's report. Even though no opinion was issued, we can only assume that Judge Lord did what he said he was going to do; certainly plaintiffs have made no showing to the contrary. We find no abuse of discretion in Judge Lord's denial of plaintiffs' motion without opinion, based as it was on his adoption of the Master's thorough and well-supported report.

Second, we have in fact studied the record on appeal in sufficient depth to convince ourselves that the Master's findings, conclusions and recommendations are amply supported by the evidence and the law.

Third, plaintiffs can still have what they have requested—a thorough review of their claims on the merits by a different district judge; they need only bring the case to trial.

Finally, we find no impropriety in Judge Lord's failure to recuse himself prior to issuing his April 30, 1979 order, or in his refusal to delay that order pending further negotiations. The basis for the recusal was the recent involvement in the case of a law firm with which Judge Lord's son-in-law is associated. That firm's involvement was tangential at best: the evidence is that the firm had not been retained to represent any party in the proceedings before Judge Lord, but rather (by agreement of both sides) to act as the "scrivener" to prepare a settlement document. Judge Lord learned only very late in the proceedings—at most four days before the April 30 order—of the firm's involvement. By then he himself had been involved with the case for over a year and a half, and was prepared to rule for the second time on plaintiffs' November 21, 1977 motion. He was acting under a mandate from this Court, issued over five months previously, to make a "prompt ruling." Reassignment of the case to another judge prior to the ruling would only have further delayed the proceedings. By his own account, Judge Lord had already delayed his ruling "while you folks went ahead and negotiated;" negotiations had been going on almost since the suit was filed, and defendants had objected to any further delay. We find no impropriety or abuse of discretion in Judge Lord's decision to rule when he did.

### III.

■ It remains only to consider the orders of June 27, 1978 and August 17, 1979, denying plaintiffs' motions for injunctions against the convening of the 1978 and 1979 annual meetings of the Bio-Medicus shareholders or the voting of shares or proxies at those meetings. Both orders were based on

findings that plaintiffs had demonstrated no irreparable injury or balance of hardships tipping decidedly in their favor if the meetings were allowed to go on as planned. These findings were clearly correct.

Plaintiffs were not in office prior to either of the annual meetings in question. Insofar as their positions with Bio-Medicus were concerned, therefore, the meetings could not change the status quo (unless, of course, plaintiffs had run for office and been elected). Rather, the injury plaintiffs feared was injury to their legal position: they were afraid that the election of new boards in 1978 and 1979, in elections untainted by the violations that allegedly occurred prior to the 1977 election or by other violations of the securities laws, would moot their November 21, 1977 motion for an injunction putting them back into power, on which all their hopes have apparently been riding. Because of this concern, plaintiffs have claimed not only that the alleged 1977 violations have "carried over" or "continued" so as to taint the 1978 and 1979 elections, but also that there were new and independent violations of the securities laws in both years.

Plaintiffs' apprehension that a subsequent election of a new board, that was truly untainted by past or present violations of the securities laws, might break the "chain of causation" flowing from the alleged past violations and moot their claim of right to be put back into power, is not without foundation.[10] *See, e. g., Schy v. Susquehanna Corp.,* 419 F.2d 1112 (7th Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Cohen v. Ayers,* 449 F.Supp. 298, 321 (N.D.Ill.), *aff'd* 596 F.2d 733 (7th Cir. 1979). However, we think that plaintiffs' proper prophylactic against any such "injury" would not be to stop the subsequent untainted election, but to run in it. On the other hand, if the subsequent elections were in fact tainted as plaintiffs

claim, they can have suffered no such injury to their legal position as they feared. In either case, therefore, they demonstrated no such irreparable injury or balance of hardships tipping decidedly in their favor as would have justified the district court in granting their motions for injunctions against the convening of the 1978 and 1979 annual meetings. This conclusion is especially warranted in view of the considerable hardship that would have been caused to the corporation and its shareholders had the meetings been enjoined. *See* Appendix at 50; Supplemental Appendix II at 55–56 and 79–80.

Each of the orders appealed from is affirmed.

---

10. Defendants in fact have argued that both the 1978 and 1979 elections should be regarded as having rendered plaintiffs' November 21, 1977 motion for injunctive relief moot. However, in view of the fact that there has so far been no determination on the merits of plaintiffs' claims

concerning the 1977 election, or the alleged carry-over of the alleged 1977 violations into 1978 and 1979, we have concluded that it would be improper for us to dispose of the November 21, 1977 motion on this basis.