Caryn J. MILLS and Susan M. Mills, not individually but derivatively on behalf of Esmark, Inc., a Delaware corporation, Plaintiffs,

v.

ESMARK, INC., a Delaware corporation; Donald P. Kelley; Roger T. Briggs; Edward J. Harrison; William P. Carmichael; Geoffrey C. Murphy; Robert E. Palenchar; Jay D. Proops; Philip L. Thomas; Earl J. Grimm; Jack A. Vickers; Samuel B. Casey, Jr.; Lester Crown; Archie R. Dykes; Jerome C. Eppler; William B. Johnson; James J. O'Connor; Richard Terrell; and Elmo R. Zumwalt, Jr., Defendants.

No. 81 C 1877.

United States District Court, N. D. Illinois, E. D.

Aug. 16, 1982.

John C. DeWolfe, Jr., Chicago, Ill., for plaintiffs.

Mayer Brown & Platt, Krupp & Miller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs, Caryn J. Mills and Susan M. Mills, brought this derivative action on behalf of Esmark, Inc. ("Esmark") against the corporation, its directors and certain of its officers. Plaintiffs allege that the assignment and award of restricted Esmark common stock and performance units to key employees of the corporation in 1979 and 1980 violated Esmark's Long Term Growth Plan ("LTGP"), the Delaware Constitution and the fiduciary duty owed shareholders by Esmark's officers and directors. Plaintiffs also allege that the circumstances under which the defendants obtained shareholder approval of the LTGP in 1979 and awarded restricted stock to key Esmark employees in 1980 violated the Securities Exchange Act of 1934. Plaintiffs allege further that the award of $1,000,000 to defendant Jack A. Vickers in 1980 was improper and a waste of corporate assets.

Plaintiffs assert finally that Esmark's Corporation Committee and Board of Directors violated the purpose of the corporation's Management Incentive Plan by declaring an award for the 1981 fiscal year in 1980. Presently before the Court are certain defendants' motions to dismiss plaintiffs' second amended complaint with prejudice or, in the alternative, for summary judgment.

The crux of plaintiffs' charges were contained in a letter of demand received by the Esmark Board of Directors on March 31, 1981.[1] Plaintiffs subsequently filed a complaint which this Court dismissed to afford time for Esmark's Special Litigation Committee ("SLC") to respond to plaintiffs' allegations. *Mills v. Esmark*, 91 F.R.D. 70 (N.D.Ill.1981). The SLC ultimately concluded that litigation involving the charges raised in the initial complaint would not be in the best interest of Esmark. SLC Report, pp. 10–12. Upon receipt of the SLC's Report, plaintiffs filed an amended complaint asserting the original claims and adding further claims against the defendants for breach of fiduciary duty and violation of the federal securities laws. Plaintiffs have since filed a second amended complaint advancing still further claims for breach of the LTGP and the Management Incentive Plan and for violation of the Delaware Constitution. Plaintiffs also allege that the SLC failed to exercise independent and good faith business judgment in evaluating their substantive claims. Defendants now seek dismissal of this action on the merits in light of the SLC's recommendation.

### I. The Special Litigation Committee Report

The Supreme Court held in *Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), that the authority of disinterested directors to terminate shareholder derivative actions is a matter properly resolved with reference to the applicable

---

1. The letter demanded that suit be brought by Esmark against 29 directors and officers to recover "[t]he increase of cash and cash equivalent remuneration paid the 29 highest directors and officers (as referred to in the proxy statement) in fiscal year 1980 over fiscal year 1979" which plaintiffs described as "excesive and unreasonable as such increase was based on the gain from the disposition of the most valuable and profitable segment of the corporation." Letter of Demand, March 26, 1981.

state law. *See also Abramowitz v. Posner*, 672 F.2d 1025, 1026 (2d Cir. 1982). In the present case, therefore, this Court must look to the law of Delaware, the state of Esmark's incorporation, to determine the effect of the SLC's conclusion that it is not in the best interest of the corporation to pursue this litigation.[2]

## A. The Standard for Reviewing Findings of a Special Litigation Committee

■ The effect of a decision by a committee of independent directors not to pursue derivative claims asserted by shareholders in a demand was addressed by the Delaware Supreme Court in *Zapata Corporation v. Maldonado*, 430 A.2d 779 (Del.Supr.1981). The *Zapata* Court made clear that, as a general rule, "a board decision to cause a derivative suit to be dismissed as detrimental to the company, after demand has been made and refused, will be respected unless it was wrongful." *Id.* at 784. The Court reasoned that the decision of disinterested directors not to pursue derivative claims "falls under the 'business judgment' rule and will be respected if the requirements of the rule are met."[3] *Id.* at n.10. *See also United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 61 L.Ed. 1119 (1917); *Galef v. Alexander*, 615 F.2d 51, 57–58 (2d Cir. 1980). Accordingly, shareholders who initiate an action purportedly on behalf of the corporation cannot maintain that action in derivative context once a committee of independent and disinterested directors determine that litigation is not in the best interests of the corporation. *Swanson v. Traer*, 249 F.2d 854, 859–60 (7th Cir. 1957).

■ This Court's review of the SLC's report, therefore, is limited to an inquiry into the disinterested independence of the members of the SLC and the appropriateness and sufficiency of the committee's investigative procedures. *Zapata, supra*, 430 A.2d at 784. *Cf. Galef, supra*, 615 F.2d at

**2.** We note at the outset that because plaintiffs' amended complaints were filed *after* the SLC completed its report, the conclusions and recommendations of the SLC do not account for all of the claims presently before the Court. The SLC Report was based solely on the allegations contained in plaintiffs' initial demand, initial complaint and "Presentation to the Litigation Committee of Esmark, Inc.," filed with this Court on July 2, 1981. Those issues not addressed by the Report will be discussed in Section II, *infra*.

The SLC's determination that pursuit of this litigation would not advance the interests of Esmark was based on the following considerations: (1) the conduct of the individual defendants violated neither state nor federal law; (2) Esmark's chance of succeeding on the merits of plaintiffs' claims would be too small to justify the expenditure of substantial legal fees; (3) even if Esmark succeeded on the merits, it is possible that recipients under the LTGP would be free to claim an increased award under the prior LTGP compensation formula, and (4) recovery of payments made to key Esmark employees under the LTGP "would seriously damage the morale of Esmark's executives." SLC Report, pp. 124–26.

**3.** Invocation of the business judgment rule to preclude review of a special litigation committee's substantive conclusions has been criticized. *See* Dent, "The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?" 75 Nw.U.L.Rev. 96, 135 (1980). Professor Dent argues that the purpose of the business judgment rule is to insulate from liability directors who have made mistaken decisions resulting in corporate losses. The shareholder plaintiffs in a derivative suit, however, do not seek to impose liability on the directors for their decision not to sue. The business judgment rule, according to this theory, is largely irrelevant to the directors' decision not to litigate.

Although we do not accept the proposition that Delaware law precludes all substantive review of a special litigation committee's findings and conclusions, *infra*, neither do we accept the proposition that the rule is irrelevant to those determinations. As a practical matter, we are bound to the Delaware Supreme Court's decision that the business judgment rule is a relevant consideration in this context. Moreover, although insulation from liability is one of the primary purposes of the business judgment rule, it is not the only reason courts invoke the rule to avoid the necessity of performing a searching substantive review of corporate decisionmaking. The rule also reflects the reality that corporate decisions are better left to those who are close to the facts and have the expertise to weigh the significance of those facts in an increasingly complex business environment. *Beard v. Elster*, 160 A.2d 731, 738–39 (Del.Ch. 1960). *See also Cohen v. Ayers*, 449 F.Supp. 298, 312 (N.D.Ill.1978), *aff'd*, 596 F.2d 733 (7th Cir. 1979). *See also Auerbach v. Bennett*, 47 N.Y.2d 619, 630, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

59; *Auerbach, supra,* 47 N.Y.2d at 623–24, 419 N.Y.S.2d 920, 393 N.E.2d 920. The "second step" of the trial court's inquiry under *Zapata,* a complete and independent review of the substantive basis of the shareholder plaintiffs' claim, is not appropriate in a case such as this where a special litigation committee, established by the board in response to a proper shareholder demand, has determined that litigation would not advance the best interests of the corporation.[4] *Abramowitz, supra,* 672 F.2d at 1030; *Maldonaldo v. Flynn,* 671 F.2d 729, 731 (2d Cir. 1982) (per curiam).

The limited scope of inquiry permitted in this context under Delaware law and the business judgment rule does not, however, bar all substantive review of the SLC's conclusions and recommendations. In cases where, as here, the shareholder plaintiffs articulate specific grounds on which to question the good faith of a special litigation committee's investigation, the Court must examine the committee's treatment of the merits of the shareholders' underlying claims in order to determine the appropriate weight to be given to the committee's recommendations. To shield our eyes entirely from the merits would prevent us from evaluating the underlying independence of the committee.

### B. Assessment of the Good Faith and Independence of the Esmark Special Litigation Committee

In the present case, Esmark's Board of Directors appointed two "outside" directors, Dr. Archie R. Dykes and Admiral Elmo R. Zumwalt, Jr. (Retired) to head the Special Litigation Committee. Although Dr. Dykes and Admiral Zumwalt were each named as defendants in this action, neither is alleged to have participated in the decisions of the Esmark Compensation Committee or to have received any payment or benefit challenged by plaintiffs in this lawsuit. The disinterested independence of Dr. Dykes and Admiral Zumwalt is not impaired merely because they were named as nominal defendants in this case.[5] *Cf. Klotz v. Consolidated Edison Co. of New York, Inc.,* 386 F.Supp. 577, 580–82 (S.D.N.Y. 1974). To hold otherwise would allow a small number of shareholders to "incapacitate an entire board of directors" merely by naming the entire board as defendants. *Zapata, supra,* 430 A.2d at 785.

Dr. Dykes' and Admiral Zumwalt's status as nominal defendants for the purpose of evaluating plaintiffs' state law claims does not, however, establish their disinterested independence for the purpose of evaluating plaintiffs' claims under section 14 of the Securities Exchange Act of 1934. As Esmark directors, Dr. Dykes and Admiral Zumwalt each participated in the alleged wrongdoing by approving the alleged misrepresentations concerning the LTGP contained in the 1979 Esmark Proxy Statement. As a practical matter, neither Dr. Dykes nor Admiral Zumwalt can be expected to exercise truly independent judgment in evaluating the propriety of their own decision to approve the proxy

4. *Zapata* establishes that the absence of a demand on the board is one of several circumstances necessitating an independent review of the shareholders' claim by the trial court. 430 A.2d at 787. The Second Circuit has interpreted this language in *Zapata* to mean that no substantive review of the claim itself or the committee's conclusions is appropriate where a demand has been made. *Abramowitz, supra.* Although the *Zapata* opinion does distinguish between demand and non-demand cases, we hesitate to draw the bright line advocated by the Second Circuit. The *Zapata* Court acknowledged that "subconscious" pressure on an ostensibly independent director while passing judgment on his fellow directors might necessitate some judicial review beyond the apparent procedural adequacy of the committee's

investigation. *Id. See also Dent, supra,* 75 Nw.U.L.Rev. at 126–27. These pressures exist regardless of whether a demand has been made on the board. Thus, the existence of a demand on the board, although certainly relevant to the *level* of appropriate substantive review, does not itself bar all such review in this Court under Delaware law.

5. The independence and good faith of Dr. Dykes and Admiral Zumwalt as well as the SLC counsel is also unimpaired by their earlier motions to dismiss plaintiffs' original complaint. Those motions, seeking dismissal on the ground that plaintiffs had failed to make adequate demand on the board under Rule 23.1, did not manifest any prejudgment of the merits of this case.

statement.[6] Accordingly, the SLC's conclusions as to plaintiffs' section 14 claim will not be afforded deference under the business judgment rule.[7]

 Plaintiffs assert a variety of alternative theories to cast doubt upon the independence or disinterestedness of the SLC in its evaluation of the state law

claims asserted in the complaint. For example, plaintiffs allege that Dr. Dykes and Admiral Zumwalt earn more money each year from their directors' fees than their limited number of shares of Esmark stock. This fact does not, however, establish any particular bias against shareholders' interests or improper affiliation with management.[8] Similarly, Dr. Dykes and Admiral

6. It is true, of course, that neither Dr. Dykes nor Admiral Zumwalt have any direct financial stake in the outcome of the plaintiffs' section 14 claim. Financial interest, however, is not the only criteria with which the disinterestedness of corporate directors can be measured. Moreover, assuming for purposes of this motion that the proxy statement at issue contained material misrepresentations, Dr. Dykes and Admiral Zumwalt's decision to approve those misrepresentations in 1979 is evidence of domination by those who profited from the section 14 violation. *Abramowitz, supra*, 672 F.2d at 1034.

Even if disinterested and independent for purposes of Delaware law, the SLC should not be permitted to cause the dismissal of federal securities law claim which alleges wrongdoing by committee members. *Cf. Burks v. Lasker, supra*, 441 U.S. at 479, 99 S.Ct. at 1837. As the Second Circuit noted in *Galef v. Alexander, supra*, 615 F.2d at 63–64:

> Obviously the goal of § 14(a) that communications from management be accurate and complete as to all material facts is a vital one. Its achievement would quite clearly be frustrated if a director who was made a defendant in a derivative action for providing inadequate information in connection with a proxy solicitation were permitted to cause the dismissal of that action simply on the basis of his judgment that its pursuit was not in the best interests of the corporation. The very premises which give life to a derivative right of action to enforce § 14(a) must save it from a premature death. In short, we conclude that to the extent that a complaint states claims against directors under § 14(a) upon which relief may be granted, federal policy prevents the summary dismissal of those claims pursuant to the business judgment of those defendant directors.

7. That members of the SLC had an interest in the resolution of plaintiffs' section 14 claim does not establish a lack of independence or disinterestedness as to plaintiffs' other claims. The focus of plaintiffs' other claims involves decisions the responsibility for which rested upon Esmark's Compensation Committee and the Executive Committee to the Board of Directors. Neither member of the SLC was on either committee. Allegations concerning the operation of the LTGP do not, therefore, implicate Dr. Dykes or Admiral Zumwalt in the

wrongdoing. *Cf. Galef v. Alexander, supra*, 615 F.2d at 66.

8. Plaintiffs also argue that Dr. Dykes and Admiral Zumwalt manifested hostility to the claims underlying this lawsuit by their reluctance to admit "the most obvious facts if those facts tended to be favorable to Plaintiffs' claims" in the course of their depositions. Second Amended Complaint, ¶ 50.E. We have reviewed the depositions of both Dr. Dykes and Admiral Zumwalt and cannot agree with plaintiffs' characterization. Moreover, the depositions of Dr. Dykes and Admiral Zumwalt were taken in November of 1981, over three months after issuance of the SLC report. Dr. Dykes and Admiral Zumwalt's effort to defend the SLC's findings does not exhibit the kind of bias or hostility necessary to establish a lack of independence or disinterestedness in the *formulation* of the committee's report.

Plaintiffs suggest further that Dr. Dykes and Admiral Zumwalt's inability to see the unfairness of defendants' participation in decisions affecting their own compensation reflects a serious lack of good faith on the part of the SLC. This suggestion, of course, presupposes that such participation was unfair—an issue around which this lawsuit and the SLC's investigation revolve. In addition, the SLC's failure to condemn such conduct reflects its assessment that the defendants did not actively participate in decisions involving their own compensation. As to the issue of defendant Donald Kelly's "participation" in meetings of the Compensation Committee, *see* Dykes Deposition, pp. 120–122. As to the issue of defendant Jack Vickers' participation in decisions affecting his compensation, *see* pp. ——–——, *infra*.

Plaintiffs argue finally that the SLC's bias is evidenced by its uncritical reliance on Edward Harrison's approval of the 1981 LTGP grant and its simultaneous rejection of his "written opinion" that certain awards under the LTGP were contingent upon a growth in Esmark earnings exceeding 5 percent per year. Edward Harrison is Esmark's Vice-President and General Counsel. Presumably, this argument is intended to demonstrate that the SLC resorted to a double standard of review as a device to avoid substantive consideration of plaintiffs' claims. However, neither prong of this double standard supports plaintiffs' position. Although Admiral Zumwalt referred to Harrison's "approval" of the 1981 LTGP grant in his depo-

Zumwalt's consistent participation in unanimous decisions on a variety of issues by the Esmark Board of Directors does not establish any lack of independence from management.[9] Indeed, several of the Board's decisions at issue in this case deviated from management's initial recommendations. Plaintiffs cannot avoid application of the business judgment rule by advancing generalized charges of bias or lack of independence.

Plaintiffs assert that the SLC's lack of independence is also evidenced by its failure to disclose a variety of facts and documents favorable to the claims advanced in their complaint. The viability of this argument as a means of invalidating the SLC's recommendations requires the Court to engage in some substantive analysis of the significance of the "undisclosed" facts and documents in relationship to the underlying allegations of wrongdoing in plaintiffs' complaint. For example, one of the claims raised in plaintiffs' "Presentation to the Special Litigation Committee" and reiterated in the second amended complaint is that the value of each share of restricted Esmark stock awarded to key Esmark employees in 1979 and 1980 under the LTGP was excessive because the total number of outstanding shares of Esmark was cut in half during that period as the result of the restructuring of Esmark and the disposition of the Trans Ocean Oil, Inc. to Mobil Oil Corporation. "Consequently," plaintiffs argue, "the retirement of [54% of Esmark's shares] approximately doubled the earnings per share on the remaining shares [including those restricted shares awarded under the LTGP], doubled the proportion of voting percentage of [those] remaining shares and had the effect of substantially increasing the market value of [those] shares." Second Amended Complaint, ¶ 44.A. Plaintiffs allege that, under these circumstances, the Esmark Board of Directors should have exercised its power to reduce the number of restricted shares awarded under the LTGP to reflect the increased "value" of each share.

▆ The "fact" purportedly favorable to plaintiffs which was not disclosed in the SLC's report was that the Esmark Board of Directors *increased* the number of shares awarded to key employees under the LTGP when Esmark declared a 5 for 4 stock split in 1981. Presumably, this undisclosed fact is viewed by plaintiffs as evidence of the Board's inconsistency in the administration of the LTGP or simply as evidence of the Board's power to alter the number of shares awarded under the LTGP. In either event, however, we do not view the SLC's failure to address this fact as material evidence of its lack of independence. The SLC's report does distinguish in general terms between the equity effect of a stock split and the kind of corporate restructuring involved in this case.[10] SLC Report, p. 110. Given the entirely different nature of each transac-

sition, Zumwalt Dep. at pp. 70–71, the SLC report did not rely on that approval. Indeed, as discussed *infra*, pp. ——–——, the SLC did not consider the propriety of the 1981 grant in any detail whatsoever because the plaintiffs' allegations concerning that grant did not arise until after the report was issued. On the other hand, the SLC's rejection of Harrison's reference to the 5 percent yearly earnings goal under the LTGP was based on the committee's own independent reading of the LTGP. In any event, we do not view the SLC's rejection of Harrison's interpretation of the LTGP as evidence of bad faith on the part of the committee.

9. We do not mean to imply, however, that a director's consistent pattern of voting with the majority of the board is entirely irrelevant to an assessment of his independence. *Cf. De Haas v. Empire Petroleum Co.*, 286 F.Supp. 809, 814 (D.Colo.1968), *mod. on other grounds*, 435 F.2d 1223 (10th Cir. 1970). In the present case, however, in light of the evidence that disagreements among board members consistently were worked out before a formal vote, the pattern of Dr. Dykes and Admiral Zumwalt's votes do not establish bias.

10. A stock split dilutes the equity represented by each outstanding share. In the course of restructuring Esmark, on the other hand, although the total number of outstanding shares of Esmark stock declined, the equity represented by each share also declined (by Esmark's deposition of TransOcean Oil, Inc., Vickers Energy Corporation and Doric Petroleum, Inc.). The fluctuations of market value and earnings per share of Esmark stock upon restructuring do not justify altering the number of shares awarded under the LTGP in the same way as the dilution of equity justifies such an alteration upon a stock split.

tion, the SLC's failure to specifically distinguish one from the other is not evidence of bias or domination.

■ Plaintiffs also argue that the SLC should have disclosed that defendant Jack A. Vickers, a member of the Esmark Board of Directors, voted favorably on a resolution which included a provision which compensated him in the amount of $1,000,000 for his role in the Esmark restructuring. Although the SLC report defends the reasonableness of such compensation, it does not discuss the implications of Vicker's vote in his own favor.[11] The SLC's failure to consider these implications reflects the fact that this allegation was not fully developed until after the SLC report was issued and that Admiral Zumwalt had a personal recollection that Vickers did not vote on his own compensation. Zumwalt Dep. at p. 12. Neither of these considerations, however, cast doubt upon the SLC's ability to independently evaluate plaintiffs' underlying claim that the payment of $1,000,000 to Vickers was a waste of corporate assets.

11. The SLC report notes that "Mr. Vickers excused himself and did not participate in those aspects of the discussion that involved his compensation" in the joint meeting of the Executive and Compensation Committees of Esmark's Board of Directors on June 26, 1980. SLC Report, p. 79. The SLC report does not reflect, however, that the minutes of the full Board of Directors suggest that Vickers did, in fact, vote on the $1,000,000 compensation resolution.

12. The substance of Mayer, Brown & Platt's conclusions were summarized in a 1980 tender offer to Esmark shareholders. That summary indicated as follows:

Esmark has been advised by Mayer, Brown & Platt that there is a proper legal basis for the conclusion that the exchange of Shares for Energy Stock constitutes a redemption of the Shares acquired by the Purchaser meeting the requirements of Section 311(d)(2)(B) of the Internal Revenue Code, although there is no exact legal precedent on this subject. Under that Section Esmark would not be required to recognize gain on the exchange. Furthermore, Mayer, Brown & Platt has advised that the Internal Revenue Service may not accept this treatment of the transaction, and may assert that Esmark did not exchange Energy Stock for the Shares. If it were finally determined that Section 311(d)(2)(B) did not apply, Esmark has esti-

Second Amended Complaint, ¶ 47. The "fact" undisclosed in the SLC report supports neither a separate cause of action against Vickers under Delaware law, 8 Del. Corp.Code § 144(a)(1), nor an inference that the SLC was biased or dominated by those accused of wrongdoing.

■ Plaintiffs also contend that the SLC failed to disclose various documents purportedly favorable to their claim. One of those documents was a legal opinion, authored by lawyers in the firm of Mayer, Brown & Platt, which expressed some doubt over Esmark's assessment of the tax benefits arising from the corporate restructuring program.[12] Second Amended Complaint, ¶ 50.I. The underlying significance of plaintiffs' tax liability claim was not, however, fully developed until after the SLC report was issued.[13] Moreover, the SLC's discussion of the tax issue with Howard J. Doherty, a partner of Arthur Young & Co., manifests that the committee analyzed the merits of plaintiffs' allegation in some detail.[14] The absence of any specific

mated that it could have a tax liability on the exchange of approximately $150 million.

13. Plaintiffs suggested in their "Presentation to the Special Litigation Committee" that "[n]o adequate provision was made in 1980 for the potential tax liability of $133 million on the sale of Mobil."

14. Although the SLC report did not discuss the Mayer, Brown & Platt opinion, the report does allude to a qualification in the 1980 Esmark Annual Report that "[i]f it were finally determined that Section 311(d)(2)(B) [of the Internal Revenue Code] did not apply, the Company has estimated that it could have an additional tax liability on the exchange [of TransOcean Oil, Inc. to Mobil for 11,918,000 shares of Esmark stock and cash] of approximately $133 million." 1980 Annual Report, p. 19. Arthur Young and Company's Report to the Board of Directors and Shareholders of Esmark, contained in the Annual Report and included in the SLC report, notes that "the income tax effects of certain matters all related to the Company's 1980 restructuring program, are not fully determinable at the present time." 1980 Annual Report, p. 29. When the SLC explored these qualifications in the Annual Report with Mr. Doherty, he indicated that he believed that Esmark's tax strategy was proper and did not necessitate the establishment of a special fund for potential tax liability. The Mayer, Brown & Platt opinion, see note 12, infra, does not shed any new light on the propriety of establishing

reference to the Mayer, Brown & Platt opinion reflects the generalized nature of plaintiffs' claim at the time of the investigation rather than the lack of independence of the SLC.

Plaintiffs also suggest that the SLC should have disclosed the existence of a corporate insurance policy which would indemnify key employees of Esmark in the event of the successful prosecution of this suit. Second Amended Complaint, ¶ 50.I. The existence of such an insurance policy no doubt would, to some extent, dilute the morale problem of Esmark executives cited by the SLC as one of several reasons for not pursuing this litigation. Although we do not agree with Dr. Dykes' subsequent assertion that the insurance issue is irrelevant to consideration of the wisdom of pursuing this lawsuit, Dykes Deposition at pp. 61–62, neither do we agree that the SLC's failure to address this issue evidences any lack of independence or disinterestedness.[15] Indeed, if the SLC's intention was to conceal all facts and documents inconsistent with its ultimate conclusion, it would not have included a summary or discussion of the variety of substantive criticisms launched against Esmark's restructuring and handling of the LTGP by sources other than the plaintiffs.[16]

The final nondisclosure cited by plaintiffs as evidence of the SLC's lack of independence is the fact that the Esmark Compensation Committee deviated from its prior formula in determining the number of restricted shares of Esmark stock to be awarded under the LTGP in 1981. This purported deviation, and the resulting higher number of shares awarded, forms the basis of "Plaintiffs' First Claim" in the second amended complaint. The SLC's failure to address this issue in detail does not, however, evidence any lack of independence or good faith. The propriety of the formula used in calculating the 1981 grant of restricted stock was not raised as an issue in this lawsuit until plaintiffs filed their first amended complaint in August of 1981, one month after the SLC issued its report.[17] The SLC cannot be held to a standard which would require them to anticipate all of plaintiffs' future arguments.

Plaintiffs also point to the scope of the SLC investigation as evidence of its lack of independence. Of the nineteen witnesses formally interviewed in the course of

such a fund under generally accepted accounting principles. Without diving into the abyss of federal corporate tax laws, we believe the SLC's reliance on the independent and expert opinion of Arthur Young & Company effectively rebuts any possible inference of bias stemming from the SLC's failure to cite the Mayer, Brown & Platt opinion.

15. To hold otherwise would dictate that future special litigation committees must address every fact and disclose every document which a court might later conclude is relevant or material to the committee's decision. No doubt the paper generated by such a holding would be overwhelming.

Moreover, the proper standard for review under the business judgment rule should be whether the parties could dispute in good faith the relevance or materiality of a particular undisclosed fact or document. In the present case, we conclude that the materiality of the insurance protection afforded key Esmark employees is a matter over which the SLC could, in good faith exercise of its business judgment, differ with plaintiffs.

16. In addition to the inclusion of Arthur Young & Company's qualifications in the 1980 Esmark Annual Report, the SLC report also contains a summary and discussion of Robert Sibson's criticism of various aspects of the LTGP. The SLC report also examines the allegations contained in an article appearing on the June 30, 1980 edition of Crain's Chicago Business. The Court has reviewed all of these documents and the SLC's responses to the criticisms contained therein. Those responses reflect the committee's attempt to exercise its business judgment in good faith.

17. On its own initiative, the SLC touched upon the propriety of the 1981 grant, particularly in the course of its second interview with Robert Palenchar on July 21, 1981. Compared to its treatment of plaintiffs' other allegations, however, the SLC's discussion of the 1981 grant lacks factual detail and legal analysis. Moreover, the Palenchar interview covers only part of plaintiffs' allegations concerning the 1981 grant. Accordingly, we view the propriety of the 1981 grant as an issue not substantively reviewed by the SLC. We do not, however, view the SLC's generalized evaluation of plaintiffs' later allegation as evidence of bad faith.

that investigation, twelve were named as co-defendants in this action. Second Amended Complaint, ¶ 50.J. With the exception of plaintiffs' counsel, the balance of those interviewed had some prior connection to Esmark's administration of the LTGP.[18] Although this distribution of witnesses might appear at the surface to be weighted in favor of the defendants, plaintiffs have failed to identify any person the SLC should have but failed to interview. The SLC proceeded on the assumption that only those individuals with some prior connection to the LTGP could, based upon personal knowledge, shed any light on the events underlying plaintiffs' claim. That assumption does not establish the SLC's lack of independence or disinterestedness.

In light of all these considerations, the Court concludes that, on the whole, the Esmark SLC's evaluation of plaintiffs' allegations was conducted in good faith and in a manner genuinely independent of those accused of wrongdoing. With those exceptions noted, the claims alleged in plaintiffs' second amended complaint which were considered in detail and rejected by the SLC are dismissed with prejudice.[19] It is so ordered. The Court will address plaintiffs' remaining claims in seriatim to determine whether there exists any genuine issue of fact material to resolution of this case.[20]

## II. Claims Not Resolved by the Esmark Special Litigation Committee

██ With the possible exception of plaintiffs' claim under section 14(a) of the Securities Exchange Act of 1934, those issues which remain after the SLC's inquiry were not presented to the board of directors in the form of a proper demand as required by Rule 23.1. Fed.R.Civ.P. Although we earlier enforced the demand requirement in response to plaintiffs' initial complaint, *Mills v. Esmark*, 91 F.R.D. 70 (1981), we decline to do so again at this later stage of the litigation. A further demand and further investigation would likely prolong rather than cut short this dispute. Moreover, because the defendant directors have now taken a clear and unequivocal position on the merits of this entire controversy in their motion for summary judgment, a further demand on the board would not be fruitful. *Cf. Nussbacher v. Continental Illinois Bank & Trust Co.*, 518 F.2d 873, 879 (7th Cir. 1975), *cert. denied*, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976).

### A. The 1981 LTGP Grant to Key Esmark Employees

On December 11, 1980, the Esmark Compensation Committee authorized an LTGP grant of 33,290 restricted shares of Esmark common stock to be made on behalf of key Esmark employees on January 2, 1981.[21]

**18.** Most of the nondefendant witnesses were consultants to Esmark during at least part of the period involved in this case. From a practical as well as legal perspective, the usefulness of these consultants' services depended on their independence from management. As evidenced by the interview of Robert Sibson, a management compensation consultant, the proposition that a consultant will always concur with management's decisions is not a foregone conclusion. Moreover, the SLC did seek out sources of criticism outside of defendants' circle. *See* note 16, *supra*.

**19.** For the reasons already indicated, the Court will not dismiss plaintiffs' initial section 14 claim on the strength of the SLC report even though the committee evaluated the substance of the claim. Further, although the SLC alluded to the propriety of Esmark's 1981 LTGP grant, the Court will not dismiss plaintiffs' claims concerning that grant merely on the basis of the SLC report. All of plaintiffs' other claims considered by the SLC will be dismissed. Those claims include Plaintiffs' Third,

Fourth, Fifth, Sixth and Seventh Claims in Count I.

**20.** The Court notes that the SLC's inquiry failed to dispose of this entire case in part because of the nature of the wrongdoing alleged and in other part because plaintiff added issues to the case by amending his initial complaint after the SLC report had been completed. In our prior opinion granting plaintiffs leave to file a second amended complaint, we noted that the allegations added to this case "reflect a reasonably good faith effort on plaintiffs' part to conform the pleadings to the facts disclosed by discovery subsequent to the filing of the prior complaint." *Mills v. Esmark, Inc.*, 81 C 1877 (N.D.Ill. February 25, 1982). Under the circumstances, however, we re-emphasize that no further such motions for leave to amend will be heard.

**21.** The shares are "restricted" in that the recipient does not take actual possession and cannot sell, assign or encumber the stock until the designated distribution date. *See* LTGP, ¶ 1d.

Plaintiffs allege in their "First Claim" under Count I that the Compensation Committee's formula for calculating the number of shares awarded under the 1981 grant violated the terms of the LTGP, was without corporate purpose and constituted a waste of corporate assets in violation of defendants' fiduciary duties to shareholders. Plaintiffs object specifically to the Compensation Committee's failure to tie the 1981 award of restricted stock to an "earnings goal" over the period ("performance period") from the date the award was made to the date the award vests with the participant (i.e. January 2, 1981 to January 2, 1984).[22]

Defendants' motion for summary judgment asserts that the Compensation Committee's calculation of the 1981 grant of restricted stock was entirely consistent with the purpose as well as the express terms of the LTGP. Defendants point out that the earnings per share of Esmark common stock jumped from $4.40 in 1979 to $21.90 in 1980 largely as the result of Esmark's restructuring program. Because that restructuring involved the one-time disposition of a substantial percentage of Esmark's total assets, defendants contend that it would be unrealistic to expect that Esmark's earnings in subsequent years would exceed or even approach those earnings achieved in 1980.[23] Thus, defendants suggest, the perpetuation of a formula which sets progressively higher earnings targets over the performance period would not be a practical incentive to management and would not advance the fundamental purpose of the LTGP.

Defendants also contend that the Compensation Committee acted within its authority under the terms of the LTGP when it abandoned the concept of an earnings goal in the 1981 grant. Although the LTGP provides for the establishment of an earnings goal, the plan also provides that the Compensation Committee has discretion to establish a "percentage ['share percentage'] of the Shares of Restricted Stock assigned to a Participant's Account to which he will be entitled if still a Participant at the end of the related Performance Period." LTGP, ¶ 2.K. Defendants argue that this language in the LTGP grants to the Compensation Committee discretion to award restricted stock to an employee *regardless* of the company's earnings as long as the employee in question is still a participant in the plan at the end of the period. Fifty percent of the restricted stock bestowed by the Committee under the 1979 and 1980 granted was awarded under this provision. The Committee raised the share percentage to 100 percent for purposes of the 1981 grant to insulate the entire award from the inevitable drop in earnings after 1980 and thus avoid the management incentive problem noted above.

■ For the purpose of a motion seeking dismissal of plaintiffs' claim on the merits, defendants' reading of the Esmark LTGP is not persuasive. That the Compensation Committee had the authority to establish a share percentage insulated from the earnings goal does not, *a fortiori*, establish that the Committee also had authority

---

Distribution of the stock takes place after completion of a "performance period" set by the Compensation Committee to measure the earnings performance of the company. LTGP, ¶¶ 1f, 5a. For purposes of the 1981 LTGP grant, the distribution date is January 2, 1984.

22. The LTGP defines the "earnings goal" as follows:

Earnings Goal—means the total targeted amount of net earnings per common share to be earned by the Company during a Performance Period. The Committee shall select the targeted amount of earnings and express it as a dollar amount per common share provided that such targeted amount shall not be less than an amount which would be equal to the total earnings per common share which

would result during the Performance Period if the earnings per common share in the first fiscal year of the Performance Period increased by the Stipulated Percentage over Base Period Earnings and the earnings in each subsequent fiscal year in the Performance Period increased by the Stipulated Percentage over the earnings of the prior fiscal year. The Stipulated Percentage shall not be less than five per cent and shall be established by the Committee.

LTGP, ¶ 2g.

23. The 1979 and 1980 LTGP grants do not suffer from this infirmity because the applicable earnings goals were set relative to base years which preceded the Esmark restructuring.

to raise the share percentage to 100 percent in order to avoid the requirement of setting an earnings goal altogether.[24] Moreover, the earnings goal was intended to encourage key Esmark employees to pursue policies which would advance Esmark's long-term corporate growth. Even if the Esmark restructuring had the effect of rendering the earnings goal obsolete, the restructuring certainly did not render the objective of long-term corporate growth obsolete. Whether the one-time disposition of a large percentage of Esmark's assets advanced Esmark's long-term growth to a sufficient extent to justify the abandonment of the earnings goal measured over several years is a legal and factual question which cannot be resolved on this record.[25]

Plaintiffs also contend that the Compensation Committee inflated the number of shares to be awarded under the LTGP in 1981 by modifying the formula used to calculate the award.[26] Defendants, apparently believing that the SLC's treatment of this issue in Robert Palenchar's interview was sufficient to justify dismissal of this claim under the business judgment rule,[27] do not offer any new evidence or new justifications for the 1981 modification. Palenchar's explanation for the modification, the substance of which is covered by the terms of the Court's protective order in this case, does not isolate why each modification was made or how such modifications served the interests of the corporation. The Court cannot, therefore, dismiss plaintiffs' claim concerning the calculation of the 1981 grant at this stage of the litigation.

■ Plaintiffs allege further that the individual defendants violated their fiduciary duty as well as the LTGP when, at the same time they approved the 1981 grant, the defendants "recommended that agreements be signed between ESMARK and each of its principal officers by which those officers' compensation would be guaranteed for two years (three years in [defendant] KELLY'S case) if the officer lost his position because of a merger or acquisition of ESMARK, for which there was no consideration."[28] Second Amended Complaint, ¶ 31. This allegation, standing alone, does not state a claim upon which relief can be granted. Plaintiffs fail to allege that Esmark and its principal officers actively entered into the agreements at issue. Plaintiffs also fail to allege that any merger or acquisition of Esmark has taken place since the agreements became effective. Whether

24. Although the Compensation Committee had authority to modify the earnings goal, LTGP, ¶ 6, and the Esmark Board of Directors had broad authority to make equitable adjustments in the plan, LTGP, ¶¶ 8, 11, that authority arguably did not envision the abandonment of the earnings goal altogether. Through whatever means, such an abandonment would seem to *render meaningless the limitation contained in* the LTGP that the Committee may not select an earnings goal that would result in a targeted amount of earnings during the performance period less than five percent per year base period earnings. LTGP, ¶ 2g.

25. *The SLC evaluated the overall fairness of the 1979 and 1980 grants under a variety of alternative assumptions.* The SLC's evaluation of those awards does not, of course, dispose of the issue of the fairness and reasonableness of the 1981 grant in light of the Compensation Committee's abandonment of the earnings goal. The crux of the fairness question in relation to the 1981 grant is whether the defendants should "benefit" from the obsolescence of the earnings goal concept when it was their own conduct in restructuring the company, for which many of the defendants had been re-warded in prior grants, which rendered the concept obsolete.

26. As plaintiffs describe the prior formula, the number of shares to be awarded was calculated by multiplying the recipients' salary by a set percentage and dividing the result by the current price of Esmark common stock. The number of shares awarded in 1981 was calculated by multiplying the recipients' salary by the set percentage and dividing the result by the earlier (i.e. lower) price of Esmark common stock and multiplying the result by four. There is no dispute that this latter formula yielded more generous results.

27. We have, of course, already determined that the SLC's generalized treatment of this issue does not merit such dismissal. *See* footnote 17, *supra*.

28. *A confidential copy of these proposed agreements is included in the record as plaintiffs'* exhibit number 10. Upon examination of this exhibit, the Court is unable to discern how the guaranties in question constitute a waste or gift of corporate assets.

any future merger or acquisition would result in a waste or gift of corporate assets because of these purported agreements is a matter not ripe for consideration here.

Accordingly, the Court grants defendants' motion to dismiss with prejudice those allegations contained in plaintiffs' first claim (Count I) which relate to Esmark's purported agreement with its principal officers to guarantee compensation in the event of a merger or acquisition.[29] The Court denies defendants' motions for dismissal with prejudice as to the balance of plaintiffs' first claim under Count I. It is so ordered.

**B. Violation of the Delaware Constitution**

In their "second claim" under Count I, plaintiffs assert that the awards of restricted stock under the LTGP in 1979 and 1980 (including the 1980 and 1981 LTGP grants) violated Article IX, Section 3 of the Delaware Constitution. That section provides:

> No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation.

Plaintiffs argue that because a recipient of restricted stock under the LTGP could be divested of his award before the end of the performance period by leaving Esmark's employ or failing to achieve the earnings goal, the grants of restricted stock under the LTGP were issued for future services, not labor done or money paid.

Plaintiffs' claim is only viable with respect to the award of restricted stock under the 1980 LTGP grant. The 1979 and 1981 LTGP awards of restricted stock were composed entirely of Esmark treasury stock. Grimm Affidavit 2, ¶ 2. Esmark did not *issue* any stock in connection with those awards. Thus, the Delaware prohibition against the issuance of stock cannot apply to the 1979 and 1981 grants.

On the other hand, it is undisputed that Esmark did issue 34,270 shares of $1 par value stock in connection with the 1980 LTGP awards. Defendants seek to avoid the prohibition of the Delaware Constitution on the ground that the issuance and award of restricted stock in 1980 was a means of compensating key Esmark employees for "previously rendered services," not future services. Esmark Board of Directors' Resolution, January 24, 1980. The defendants' characterization of these awards does not, however, dispose of plaintiffs' claim as a matter of law. As a practical matter, the 1980 LTGP award of restricted stock includes attributes of compensation for future as well as past services.[30] The Court cannot determine on the basis of this record whether the 1980 LTGP grant of restricted stock was intended primarily as compensation for past or future services.

Accordingly, defendants' motions to dismiss with prejudice are granted on plaintiffs' second claim (Count I) as to the 1979 and 1981 LTGP grants. Defendants' motions are denied as to the 1980 LTGP grant. It is so ordered.

**C. Violation of the Esmark Management Incentive Plan**

The Esmark Incentive Plan ("MIP"), adopted annually by the Board of Directors pursuant to stockholder authorization obtained in 1969, provides that certain employees of Esmark are eligible for cash awards upon the attainment of prescribed targets involving company earnings and/or personal goals. Awards under the MIP are entirely separate from grants made under the LTGP. In their eighth claim under Count I, plaintiffs allege that the Esmark Compensation Committee and Board of Directors "violated the adopted purpose of the Management Incentive Plan" by issuing the

---

**29.** We do not intend, by this order, to foreclose plaintiffs from raising a separate cause of action in the future based on these agreements if and when a merger or acquisition of Esmark takes place.

**30.** For example, fifty percent of a recipients' "award" of restricted stock under the 1980 grant was contingent upon Esmark reaching its earnings goal over the performance period (originally, fiscal years 1980 and 1981). The earnings goal clearly was intended as an incentive for management to exercise its best efforts in pursuing future corporate growth. To overlook this contingency on the ground that the issuance of stock was connected solely to the initial award of restricted shares would elevate form over substance.

maximum awards permitted under the MIP for the 1981 fiscal year in 1980, before the results of the 1981 fiscal year were determined and "without regard to any incentive." Second Amended Complaint, ¶ 48.

■ Without expressing an opinion as to the underlying merits of any future action based upon Esmark's 1981 MIP award, the Court notes that plaintiffs' current allegation does not state a claim upon which relief can be granted. Although plaintiffs allege that the Board's acceleration of the 1981 MIP award violated the adopted purpose of the plan, plaintiffs do not identify that purpose, explain how the acceleration of the award violated the purpose or whether the acceleration violated the terms of the plan itself.[31] Plaintiffs' unexplained conclusion that these awards were made "without regard to any incentive" is not sufficient to raise this allegation to the level of a claim upon which relief can be granted. Accordingly, plaintiffs' eighth claim of Count I is dismissed. It is so ordered.

### D. Violation of Securities Laws

In Counts II and III, plaintiffs allege that Esmark's 1979 Proxy Statement contained a variety of material misrepresentations and omissions with regard to the LTGP in violation of section 14 of the Securities Exchange Act of 1934 and Rule 14a–9 of the Securities and Exchange Commission.[32] Second Amended Complaint, ¶¶ 54, 57–59. Plaintiffs also allege that the 1981 award of restricted stock under the LTGP constituted a device or scheme to defraud Esmark and its shareholders in violation of section 10 of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission.[33] Second Amended Complaint, ¶ 56. As a threshold matter, defendants argue that these claims should be dismissed with prejudice on the ground that each such allegation is merely an attempt to bootstrap plaintiffs' state law claims into federal securities law violations. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–79, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Upon examination of the specific allegations underlying plaintiffs' securities law claims, the Court finds defendants' threshold argument persuasive as to the entirety of Count III and parts of Count II of plaintiffs' second amended complaint.

■ Plaintiffs allege in Count III that the Esmark 1979 Proxy Statement describing the LTGP "became materially false and misleading" as the result of defendants' various decisions to change the method by which LTGP awards were calculated and distributed in 1980 and 1981. Although framed as a claim under section 14 of the Securities Exchange Act, the crux of plaintiffs' objection in Count III is directed against the propriety and lawfulness of the changes made in the LTGP, not the accuracy or completeness of the proxy statement as such. Plaintiffs' reference to the proxy statement as a device to bootstrap the state law claims into federal securities law violations does not rise to the level of an independent claim for relief under section 14 of

---

**31.** The record does not include a copy of the 1981 MIP. Plaintiffs have included a copy of the 1977 MIP as confidential exhibit number 11. Since the MIP is subject to amendment each year the Board of Directors adopts the plan, it is not altogether clear how plaintiffs expect their copy of the 1977 MIP to shed light upon an alleged violation of the 1981 MIP.

**32.** Section 14(a) of the Act prohibits the solicitation of proxies in contravention of SEC rules. 15 U.S.C. § 78n(a) (1976). Rule 14a–9(a), in turn, provides that "[n]o solicitation ... shall be made ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading...." 17 C.F.R. § 240.14a–9(a) (1981).

**33.** Section 10(b) of the Act makes it unlawful for any person to use or employ any manipulative or deceptive devise or contrivance in contravention of SEC Rules. 15 U.S.C. § 78j(b) (1976). Rule 10b–5 prohibits the use of "any device, scheme, or artifice to defraud," "any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or "any act, practice, or course of business which operates or would operate as a fraud or deceipt upon any person" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5 (1981).

the Securities Exchange Act. *Cf. Santa Fe Industries, supra,* 430 U.S. at 478, 97 S.Ct. at 1303; *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1289–90 (N.D.Ill.1981).

All of the misconduct alleged in Count III occurred after the issuance of the proxy statement. Plaintiffs make no allegation in this count that the representations contained in the 1979 proxy statement were materially false or misleading when made. Plaintiffs thus have failed to allege a violation of Rule 14a–9 which prohibits only those misrepresentations or omissions which are false or misleading "at the time and in the light of the circumstances under which [they are] made." 17 C.F.R. § 240.14a–9(a) (1981). Accordingly, the Court grants defendants' motions for summary judgment as to Count III of plaintiffs' second amended complaint. It is so ordered.

Plaintiffs raise a separate section 14 securities claim in Count II of the second amended complaint. Although Count II also alleges a variety of material misrepresentations and omissions in the Esmark 1979 Proxy Statement, the substance of most of the misrepresentations and nondisclosures detailed in this count purport to establish that the proxy statement was materially misleading when issued rather than upon the occurrence of future events.[34] The crux of plaintiffs' first claim under Count II, therefore, relates to the manner in which the LTGP was presented to Esmark shareholders for approval. Although related to plaintiffs' state claims, this federal securities law claim has a life of its own which must be evaluated on the merits.

The Esmark SLC evaluated the significance of a number of the misrepresentations and omissions alleged in Count II in its treatment of the related state law claims and its attempt to deal with plaintiffs' securities law claim. Although instructive, the SLC's conclusions regarding the 1979 proxy statement are not binding on this Court insofar as those conclusions purport to resolve plaintiffs' federal claims. This is true not only because the members of the SLC allegedly participated in the federal wrongdoing, but also because the focus of the SLC's state law inquiry was different than the focus of this Court's federal securities law inquiry.[35]

The specific misrepresentations and omissions detailed in Count II fall into a variety of substantive categories relating to the terms and objectives of the LTGP. Defendants challenge the materiality of each of the categories on the premise that there is no substantial likelihood that a "reasonable shareholder" would have considered such disclosures or nondisclosures important in deciding whether to approve the LTGP.[36] *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Defendants also argue that the disclosures and nondisclosures in the 1979 proxy statement, even if material, are not causally linked to the injury allegedly suffered by Esmark as the result of defendants' administration of the LTGP. Neither of these arguments, however, are sufficient to permit this Court to dismiss plaintiffs' claim as a matter of law.[37]

---

**34.** Plaintiffs cite those future events, of course, as evidence of the misleading character of the proxy statement when issued.

**35.** For example, the SLC expended considerable effort to establish that Esmark intended to include capital gains (i.e. the gain realized upon the disposition of a significant share of Esmark's assets) in the formula for calculating the amount of case awards under the LTGP and in determining whether a given earnings goal had been met. SLC Report, pp. 54–60. This determination, although dispositive as to whether defendants' inclusion of capital gains in the formula actually violated the LTGP, does not itself dispose of plaintiffs' section 14 claim that the proxy statement, taken as a whole,

promoted the contrary impression. *See* discussion, *infra,* pp. 1293–1294.

**36.** We note that the issue of materiality is a mixed question of law and fact which, although potentially capable of resolution as a matter of law, is ordinarily inappropriate for summary judgment. *Securities and Exchange Commission v. Texas International Co.,* 498 F.Supp. 1231, 1245–46 (N.D.Ill.1980).

**37.** Defendants' causality argument is disingenuous. Carried to its logical result, this analysis would hold that because the proposal upon which shareholders were asked to vote was not self-executing, no misrepresentation in the proxy statement soliciting that vote would be actionable under section 14. Such a result

The 1979 Esmark Proxy Statement contained a summary description as well as the complete text of the LTGP. The most significant category of misrepresentations and omissions detailed in Count II relates to particular language contained in the LTGP and in the proxy statement's summary of the plan which allegedly implies that the plan is intended to reward key employees for their contribution to Esmark's long-term growth, not their contribution to Esmark's capital gain resulting from the one-time disposition of corporate assets. Second Amended Complaint, ¶ 54.A–B. Defendants counter these alleged misrepresentations with reference to the fact that the express terms of the LTGP rely upon Esmark's "net earnings per common share" as the yardstick to measure awards under the plan. *See* LTGP, ¶ 2g, h, i. Defendants contend that a reasonable investor would know that "net earnings per common share" includes capital gains.

Taken in isolation, defendants' argument appears persuasive. As an accounting principle, the LTGP's "net earnings per common share" yardstick would include those gains realized upon the disposition of corporate assets. We assume that the proverbial "reasonable shareholder" would understand the meaning of this widely-used accounting term. *Cf. Greenapple v. Detroit Edison Co.,* 468 F.Supp. 702, 711–12 (S.D.N.Y.1979), *aff'd,* 618 F.2d 198 (2d Cir. 1980). This is particularly true given that Esmark's 1978 Annual Report used the same term to refer to earnings which clearly included capital gains. *See* Esmark 1978 Annual Report, p. 39. Defendants' focus on a reasonable shareholder's abstract understanding of "net earnings per common share" does not, however, respond directly to plaintiffs' alle-

gation that the total mix of information available to Esmark shareholders in 1979 suggested that awards under the LTGP would compensate key employees for their contributions to Esmark's long-term growth rather than gains realized upon its short-term shrinkage.[38] The total mix of information could well have led a reasonable investor to believe that net earnings per common share under the LTGP meant something other than net earnings per common share in the annual report or other financial documents.

Plaintiffs also challenge the representation in the 1979 Proxy Statement that independent compensation consultants recommended the LTGP to the Esmark Compensation Committee. Second Amended Complaint, ¶ 54.E. In fact, plaintiffs point out, the independent compensation consultants hired by Esmark, Sibson and Company, did not make any recommendations as to which compensation scheme Esmark ought to adopt. Indeed, in his appearance before the SLC, the consultant whose "recommendation" was reported in the proxy statement voiced a number of substantive objections to the formula utilized (and authored) by Esmark in making its LTGP awards.

Defendants challenge the materiality of this misrepresentation on two grounds. First, defendants note that the consultants named by Esmark did present to the Compensation Committee a variety of alternative compensation plans similar to the LTGP. Defendants argue that the difference between presenting a variety of compensation plans and recommending the LTGP is semantic. Although arguably true in the abstract, defendants' argument does

---

would, of course, render the proxy statement worthless. Moreover, since the award of substantial cash and stock grants to key employees could not have been accomplished without some shareholder approval, it is clear that the proxy solicitation itself was an essential link in the accomplishment of the transactions at issue in this case. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

**38.** The "total mix" of information relied upon by plaintiffs ranges from the title and stated

objective of the plan to the substantive provisions of the LTGP which measure the performance of Esmark over several years for the purpose of issuing LTGP awards. Plaintiffs also note that the word "earnings" in the MIP, approved by shareholders in 1969, did not include "extraordinary items (changes or credits) of a non-recurring nature." It is not inconceivable that a reasonable shareholder, considering all of this information, could have concluded that net earnings per common share envisioned only those earnings derived from growth transactions of a long-term nature.

not account for the fact that the consultants' objections to the LTGP, as voiced by Robert Sibson, were substantive, not semantic. The "recommendation" language in the proxy statement cannot be glossed over so easily.

Defendants also argue on the authority of the Third Circuit's opinion in *Ash v. LFE Corporation*, 525 F.2d 215 (3d Cir. 1975), that language in a proxy statement about the role of outside consultants in formulating incentive plans is not material. *Ash* does not, however, support defendants' position. In *Ash*, the disputed proxy statement had indicated that the Board of Directors had "proposed" the plan under consideration when, in fact, it had been prepared by outside consultants. The Court declared that this alleged defect in the proxy statement was trivial. 525 F.2d at 218. In the present case, however, the imprimatur reported in the proxy statement was the recommendation of an independent consultant, not merely the proposal of the Board of Directors. The former constitutes an endorsement from an independent group of experts. The latter constitutes a proposal from the corporation's board of generalists. We cannot conclude, therefore, that the misrepresentation alleged in the present case is immaterial as a matter of law.

Accordingly, the Court denies defendants' motions to dismiss with prejudice those allegations of Count II which involve the inclusion of capital gains in the LTGP and the recommendations of independent consultants. It is so ordered.

█ The remaining misrepresentations and omissions alleged in plaintiffs' first claim under Count II are either not materially misleading or otherwise not actionable under section 14. For example, plaintiffs allege that the representation in the proxy statement that "[t]he Board of Directors believes that the 1974 Stock Option Plan and preceding stock option plans have served the Company well" was misleading because, in fact, the preceding stock option plans had not served the Company well. Second Amended Complaint, ¶ 54.F. Plaintiffs' assessment of the success or failure of prior incentive plans does not, however, render a statement about the Board of Directors' assessment of those plans misleading. Moreover, plaintiffs do not allege and have not otherwise demonstrated any particular connection between the proxy statement's unrealistically favorable view of prior incentive plans and Esmark shareholders' adoption of the LTGP. We cannot infer materiality on this record.

█ Plaintiffs also allege that the section of the LTGP reprinted in the proxy statement concerning the independence of the Compensation Committee from management was "proven to be false" by subsequent events. Plaintiffs argue that this representation was false when made because defendants knew that Donald P. Kelly, President of Esmark, would dominate the Compensation Committee in contravention of the LTGP. The fact remains, however, that defendants' alleged expectation of Kelly's influence amounted to nothing more than speculation about the future independence of the Committee. Defendants were not obligated to disclose that speculation or otherwise temper the language of the LTGP to reflect such an expectation. It is well established that representations concerning the purported independence of a corporate committee are not generally actionable under the securities laws. *Cf. Gaines v. Haughton*, 645 F.2d 761, 776–77 (9th Cir. 1981); *Cohen v. Ayers*, 596 F.2d 733, 745 (7th Cir. 1979).

█ Plaintiffs next allege that the section of the LTGP providing for the setting of a performance period was proven to be false when the Compensation Committee failed to establish such a period in connection with the 1981 LTGP grant. This bootstrap of plaintiffs' state law claim does not constitute a separate cause of action under the federal securities laws. *Santa Fe Industries, supra*, 430 U.S. at 477–79, 97 S.Ct. at 1302–04. Plaintiffs do not even purport to allege that this representation in the proxy statement was false when made. Accordingly, plaintiffs' allegation does not rise to the level of a violation of section 14.

Plaintiffs finally assert that the 1979 proxy statement failed to disclose that the restructuring of Esmark in 1980 would unfairly increase the value of the LTGP awards and that the performance periods utilized in calculating awards under the plan would overlap so as to permit the Compensation Committee to count the earnings of a profitable year more than once. Neither of these alleged nondisclosures, however, are actionable under section 14. Defendants were under no obligation to disclose plaintiffs' theory concerning the potential effect of Esmark's restructuring, a project which was not even anticipated at the time the Board submitted the LTGP for shareholder approval.[39] Moreover, as already noted, plaintiffs' theory does not accurately describe the effect of Esmark's restructuring. Defendants cannot be held to a standard of disclosure which requires consideration of all possible contingencies and all possible results flowing from those contingencies.

Similarly, defendants were under no obligation to disclose the overlap between performance periods in the LTGP. The terms of the LTGP made relatively clear that since performance periods generally extended over more than one year, the calculation of LTGP awards in successive years would necessarily include overlapping performance periods. In contrast to the conflicting mix of disclosures concerning the inclusion of capital gains in the LTGP formula, nothing in the LTGP itself or in the summary of the LTGP could lead a reasonable shareholder to believe that performance periods would not overlap. This purported nondisclosure, therefore, was not material.

Accordingly, with those exceptions already noted, defendants' motions for summary judgment on plaintiffs' first claim in Count II is granted. It is so ordered.

In their second claim in Count II, plaintiffs allege that the 1981 award of restricted stock under the LTGP constituted a scheme to defraud Esmark and its shareholders in violation of section 10 of the Securities Exchange Act of 1934 and SEC Rule 10b–5. Second Amended Complaint, ¶ 56. This conclusory allegation, however, is clearly insufficient to support a cause of action under section 10. Except for those state law objections raised in Count I, plaintiffs fail to allege how either Esmark or its shareholders were deceived in connection with the 1981 LTGP grant. To the extent the award of the grant itself constituted the scheme or device to defraud, plaintiffs' claim is entirely subsumed within Count I and does not support a cause of action under the federal securities laws. *Santa Fe Industries, supra,* 430 U.S. at 477–79, 97 S.Ct. at 1302–04. Accordingly, defendants' motions for summary judgment as to plaintiffs' second claim (Count II) is granted. It is so ordered.

### III. Conclusion

In summary, defendants' motions to dismiss with prejudice or for summary judgment are granted as to certain allegations contained in plaintiffs' first and second claims under Count I. Defendants' motions are also granted as to the entirety of plaintiffs' third, fourth, fifth, sixth and seventh claims under Count I. Plaintiffs' eighth claim under Count I is dismissed. Defendants' motions are denied with respect to those allegations contained in plaintiffs' first and second claims under Count I as identified in the text of the opinion.

Defendants' motions are also granted as to certain allegations contained in plaintiffs' first claim under Count II and as to all of plaintiffs' second claim under Count II as well as the entirety of Count III. Defendants' motions are denied with respect to those allegations contained in plaintiffs' first claim under Count II as identified in the text of the opinion. It is so ordered.

---

**39.** The deficiency of this claim is in sharp contrast to plaintiffs' earlier claims that certain affirmative representations in the proxy statement misled shareholders as to the actual meaning and objective of the LTGP itself. *See* discussion, *supra,* pp. 1293–1294.