**Caryn J. MILLS and Susan Mills, not individually but derivatively on behalf of Esmark, Inc., a Delaware corporation, Plaintiffs,**

**v.**

**ESMARK, INC., a Delaware corporation; Donald P. Kelly; Roger T. Briggs; Edward J. Harrison; William P. Carmichael; Geoffrey C. Murphy; Robert E. Palenchar; Jay D. Proops; Philip L. Thomas; Earl J. Grimm; Jack A. Vickers; Samuel B. Casey, Jr.; Lester Crown; Archie R. Dykes; Jerome C. Eppler; William B. Johnson; James J. O'Connor; Richard Terrell; and Elmo R. Zumwalt, Jr., Defendants.**

**No. 81 C 1877.**

United States District Court, N.D. Illinois, E.D.

Sept. 6, 1983.

---

See also D.C., 544 F.Supp. 1275.

John C. DeWolfe, Jr., Richard J. Stevens and Lawrence C. Mills, Chicago, Ill., for plaintiffs.

Michael Shakman, Krupp & Miller, Robert J. Kriss, Mayer, Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Caryn J. Mills and Susan M. Mills brought this derivative action on behalf of Esmark, Inc. ("Esmark") against the corporation, its directors and certain of its officers. Plaintiffs' allegations arose

from the assignment and award of restricted Esmark common stock and performance units to key employees in 1979, 1980 and 1981 pursuant to a Long-Term Growth Plan ("LTGP") approved by the shareholders. In light of the recommendation of an Esmark Special Litigation Committee comprised of disinterested, outside directors ("1st SLC") not to pursue plaintiffs' charges, defendants moved for dismissal with prejudice of the second amended complaint or for summary judgment. This Court granted the motion with respect to issues considered impartially by the 1st SLC and denied the motion with respect to issues not considered by the 1st SLC and issues in which certain members of the 1st SLC were involved. A second Special Litigation Committee ("2nd SLC") has investigated those issues left unresolved by this Court's earlier decision and has recommended that Esmark not pursue the allegations. On the basis of the 2nd SLC's report, Esmark and the individual defendants now move for dismissal with prejudice or summary judgment on the remaining claims. For the reasons stated below, the motion will be granted.

## I. Remaining Claims

Three major allegations remain unresolved. First, plaintiffs allege that the 1981 grant to key Esmark employees was a departure from provisions of the Long-Term Growth Plan ("LTGP") as approved by shareholders, and that the actions of Esmark's Compensation Committee and Board of Directors in approving and ratifying the 1981 grant were without corporate purpose, a waste of corporate assets, a gift of corporate assets and a violation of fiduciary duty. Second, plaintiffs allege that the 1980 grant violated Article IX, § 3 of the Delaware Constitution, which provides that no corporation shall issue stock except in return for valid consideration. Third, plaintiffs allege that the proxy statement seeking shareholder approval of the LTGP was false and misleading in that: (1) it did not state that awards could be made on the basis of extraordinary, non-recurring capital gains; and (2) it stated that the LTGP was based upon the recommendations of compensation consultants. It is alleged that these misstatements and omissions were made in violation of § 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n and Rule 14a–9 thereunder.

## II. Standard of Review

The authority of disinterested directors to terminate a shareholder derivative action is a matter properly resolved with reference to the applicable state law. *Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979). In this case, we look to the law of Delaware, the state of Esmark's incorporation, to govern the issue.

In *Zapata Corporation v. Maldonado*, 430 A.2d 779 (Del.Supr.1981), the Supreme Court of Delaware enunciated the standards to be applied in reviewing the decision of disinterested directors not to pursue the claims of shareholders. When shareholders, after making demand and having their suit rejected, attack the board's decision as improper, the board's decision falls under the "business judgment" rule and will be respected if the requirements of the rule are met. *Id.* at 784, n. 10. The issues for judicial inquiry are thus limited to independence, good faith and reasonable investigation. *Id.* at 787. Where, as in *Zapata*, demand was excused due to futility, the situation may call for judicial caution beyond adherence to the business judgment rule. *Id.* In such a case, the court may, in its discretion, proceed to a "second step" and apply its own independent business judgment. The purpose of the second step is to thwart instances where corporate actions meet the criteria of the business judgment rule, but the result does not seem to satisfy its spirit. *Id.* at 789. Thus, where demand has not been made due to futility, the corporation bears the initial burden of establishing its good faith and independence in seeking termination of the suit, and even then its judgment is subject to the court's objective scrutiny. *Abramowitz v. Posner*, 672 F.2d 1025, 1031 (2d Cir.1982).

In this case, plaintiffs made a demand on the board of directors of Esmark in March of 1981 that suit be brought by Esmark against 29 directors and officers to recover the increase in "cash and cash equivalent remuneration" received by those individuals in 1980. Plaintiffs filed this lawsuit on April 3, 1981, before Esmark had responded to the demand letter. On June 18, 1981, this Court granted defendants' motion to dismiss the action without prejudice pending the board's response to plaintiffs' demand. The board then established a Special Litigation Committee ("1st SLC") comprised of two outside directors to investigate the matter. On July 31, 1981, the 1st SLC issued its report, which concluded that the challenged payments and awards were reasonable, proper and lawful, and that legal challenge to them would not be in the corporation's best interests. Plaintiffs then filed an amended complaint, reasserting the original claims and adding claims for breach of fiduciary duty and violation of the federal securities laws. In February of 1982, plaintiffs filed a second amended complaint, further modifying their claims against defendants. Defendants then moved for dismissal with prejudice or summary judgment on the basis of the 1st SLC's report.[1]

In considering defendants' motion, this Court applied a test of good faith, independence and reasonable investigation to those claims reviewed by the 1st SLC upon demand by plaintiffs. *Mills v. Esmark*, 544 F.Supp. 1275 (N.D.Ill.1982). With respect to the claims that had *not* been presented as a demand on Esmark's board, however, we stated as follows:

With possible exception of plaintiffs' claim under section 14(a) of the Securities Exchange Act of 1934, those issues which remain after the SLC's inquiry were not presented to the board of directors in the form of a proper demand as required by Rule 23.1. Fed.R.Civ.P. Although we earlier enforced the demand requirement in response to plaintiffs' initial complaint, *Mills v. Esmark*, 91 F.R.D. 70 (1981), we decline to do so again at this later stage of the litigation. A further demand and further investigation would likely prolong rather than cut short this dispute. Moreover, because the defendant directors have now taken a clear and unequivocal position on the merits of this entire controversy in their motion for summary judgment, a further demand on the board would not be fruitful. *Cf. Nussbacher v. Continental Illinois Bank & Trust Co.*, 518 F.2d 873, 879 (7th Cir.1975), *cert. denied*, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976).

Despite excused demand, Esmark established a 2nd SLC, appointing outside director Julia M. Walsh as the committee's sole member. Mrs. Walsh had no affiliation with or connection to Esmark until being elected to its board of directors in March of 1982; it is undisputed that she was not involved in any of the matters giving rise to this litigation. The 2nd SLC conducted an extensive investigation into the remaining charges and submitted a lengthy report which recommends that it is in Esmark's best interest to seek dismissal of the claims.[2]

Plaintiffs do not directly challenge the good faith and independence of the 2nd SLC's report. Moreover, this Court has

---

**1.** The *Zapata* court discussed the form of a motion made by defendant directors to terminate an action under the business judgment rule as follows:

The nature of this motion finds no ready pigeonhole, as perhaps illustrated by its being set forth in the alternative. It is perhaps best considered as a hybrid summary judgment motion for dismissal because the stockholder plaintiff's standing to maintain the suit has been lost.

430 A.2d at 787.

The motion now pending before the Court seeking termination of the remainder of plaintiffs' action is similarly framed as an alternative motion for dismissal with prejudice or summary judgment.

**2.** The 2nd SLC explicitly based its report and recommendation on the following facts: (1) merits of the claims; (2) fairness of the results of the challenged actions; (3) damages resulting from the challenged actions; (4) effects on morale if the challenged awards were to be invalidated; and (5) cost of pursuing the claims.

reviewed the report and concludes that it is based on a sound, thorough and independent investigation. In deference to *Zapata's* suggestion that great caution be exercised in dismissing claims on the basis of a directors' report where demand was excused for futility, however, we shall review the specific challenges raised by plaintiffs to the 2nd SLC's report.

### III. Plaintiffs' Challenges to 2nd SLC Report

■ Plaintiffs' challenges are largely in the form of alleged omissions from the report purportedly suggesting that the committee's recommendation was wrongful. Plaintiffs' contentions require us to analyze objectively the significance of undisclosed and/or unscrutinized "facts" in relation to the allegations of wrongdoing in plaintiffs' complaint.

First, plaintiffs assert that the 2nd SLC's report neglects to mention the "enormous payments that have been made to management beneficiaries under the LTGP," payments which totalled (in plaintiffs' estimation) more than $23 million over a three-year period. Plaintiffs fail to explain, however, the relevance of the total value of the 1979, 1980 and 1981 grants to their remaining claims. The 1st SLC investigated the 1979 and 1980 grants, concluding that the grants were fair and consistent with the LTGP. All that remains in terms of the size of the grants are plaintiffs' common law challenges to the 1981 grant and the question of whether the 1980 awards of stock satisfied Delaware constitutional requirements. We fail to understand how the aggregate total of awards made over the three-year period is relevant to the propriety of the 1981 grant or the constitutionality of the 1980 grant.

Next, plaintiffs assert that the formula set forth in the LTGP for calculation of performance units is unfair.[3] We are again unable to find the relevance of this assertion to the issues now before the Court. No performance units were awarded in the 1981 grant, and the fairness of the 1979 and 1980 grants (which were partially comprised of performance units) has already been adjudicated. Plaintiffs cannot intend this assertion to relate to their claims of proxy misstatements, for the formula was set forth in the 1979 proxy statement and approved by 96% of the shareholders. The assertion is furthermore not relevant to plaintiffs' challenge to the 1980 grant under Article IX, § 3 of the Delaware constitution, since that provision concerns the issuance of *stock* rather than cash bonuses. If, as plaintiffs assert, the 2nd SLC did not conduct an in-depth evaluation of the "fairness" of the performance unit formula, it was because the formula's fairness was not the subject of legal claims analyzed by the committee.

Plaintiffs next assert that the 2nd SLC failed to consider the "unfairness" of the inclusion of non-recurring, extraordinary gains from the sale of one of Esmark's major subsidiaries in the calculation of the value of performance units. In their complaint as it remains before this Court, plaintiffs' sole challenge relating to the inclusion of capital gains in the computation of performance units is that the 1979 proxy statement neglected to explain that capital gains would be included in the computation of awards. This issue was exhaustively considered by the 2nd SLC. *See* Report of 2nd SLC at 59–76.[4] Plaintiffs do not chal-

---

**3.** The LTGP had two components: restricted stock and performance units. Performance units were to be paid in cash at the end of a "performance period" if the earnings goal was met and if the recipient was still employed by Esmark. The amount of the cash award was determined by a formula that multiplied price per share by a fraction consisting of base period earnings in the denominator and base period earnings plus total net earnings per common share for the performance period minus the computation of base period earnings times the number of years in the performance period. Thus, performance units reflected increases in earnings and value per common share. Plaintiffs' basic objection is to the geometrical nature of the increase in performance units as a result of increases in earnings or share value.

**4.** The SLC reviewed the applicable legal standards and determined that:

In order to treat the Proxy Statement as misleading with respect to this issue, it would be necessary to make the following assump-

lenge the analysis of the report nor do they provide any support for their claim that the proxy contained a material misstatement in violation of § 14 of the Securities Exchange Act. Instead, the gist of plaintiffs' new argument is that it is unfair for executives in various segments of the corporation to profit from the sale of an unrelated segment. If this contention were accepted in principle, virtually all bonus incentive plans of large corporations could be considered "unfair" unless each bonus award were tied solely to increased profits attributable to each specific award recipient. As defendants point out, corporations should be free to institute long-range compensation plans that promote overall company goals rather than individual goals. At any rate, this contention does not lead us to conclude that the 2nd SLC's recommendation on the issue of the proxy statement was based on inadequate investigation or was otherwise wrongful.[5]

In their second amended complaint, plaintiffs allege that the 1979, 1980 and 1981 grants violated Article IX, Section 3 of the Delaware Constitution, which provides:

> No corporation shall issue stock, except for money paid, labor done or leases thereof actually acquired by such corporation.

Second Amended Complaint, Count I, Second Claim. In this Court's August 16, 1982, opinion, the claim was dismissed with respect to the 1979 and 1981 grants because those awards were comprised of treasury stock, not issued shares. The claim was not dismissed with respect to the 1980 grant because the Court could not determine on the basis of the record at that time whether the 1980 award of restricted stock

was intended primarily as compensation for past or future services. 544 F.Supp. at 1291.

■ Section 153(a) of the Delaware Corporation Law provides that where par value stock is to be issued, the consideration must at least equal the par value of the stock. In this case, par value of the shares was $1, with approximately 34,000 shares awarded. By its investigation and report, the 2nd SLC has filled gaps in the record and has shown by reference to depositions and affidavits that the 1980 awards were authorized by the board of directors in compensation for past services rendered. 2nd SLC Report at 77–86. The directors' valuation of non-cash consideration is conclusive unless actual fraud is proven. *Fidanque v. American Maracaibo Co.*, 33 Del.Ch. 262, 92 A.2d 311, 321 (Del.Supr. 1952). Plaintiffs have not challenged the evidence or conclusions presented in the 2nd SLC's report, nor have they attempted to show actual fraud in the issuance of the 1980 stock awards. Instead, plaintiffs turn their original allegation on its face by now contending that because the Compensation Committee had the power to waive the requirement that recipients must remain in Esmark's employ during the performance period in order to receive their awards, there was no guarantee that consideration would eventually be received from the beneficiary in return for the LTGP benefits. Plaintiffs' new argument does not convince us that this aspect of the 2nd SLC's report was wrongful.

The final three alleged defects in the LTGP raised by plaintiffs as absent from the 2nd SLC report will not be addressed,

tions: (a) That a reasonable shareholder would interpret corporate "growth" as referring to something other than the increase in the value of the stock. (b) That the reasonable shareholder would assume, in addition, that the measurement of "growth" would not include gains realized upon the sale of major operating assets, even though sold at a significant profit to the benefit of the Company. (c) That the reasonable shareholder would assume that such sales would, in fact, take place in the future and would have a significant

impact on earnings per share and on LTGP awards.
2nd SLC Report at 66. The committee then analyzed each assumption and concluded that each was doubtful. We find the analysis to be sound, and as it is not challenged by plaintiffs other than as discussed in text above, we will not discuss it in detail.

5. Plaintiffs' contention is not relevant to the fairness of the 1981 awards, as no performance units were then awarded.

as these "defects" have no relevance to the issues before the Court.[6]

Finally, plaintiffs suggest that the 2nd SLC's report was wrongful because it did not explain the time sequence of the preparation of the LTGP. The time sequence presumably bears upon plaintiffs' contention that the proxy statement was false and misleading due to language stating that the proposed growth plans had been "recommended by the Compensation Committee of the Board of Directors upon consideration of the recommendations of the Company's compensation consultants...." Contrary to plaintiffs' current assertion, the 2nd SLC carefully considered the time sequence of the plan's preparation and the degree of input by compensation consultants, concluding that the proxy language was accurate and would not support a finding of negligence under § 14 of the Securities Exchange Act. 2nd SLC's Report at 33–58.

In short, we find that defendants have met their burden of showing that the 2nd SLC's report was made after a thorough investigation and in good faith and independence. Plaintiffs have presented no substantive arguments as to why the report was "wrongful" or why deference to the report's conclusions would violate the spirit of the business judgment rule. Defendants' motion for dismissal with preju-

dice or summary judgment will be granted as to all remaining counts.[7]

## IV. Rule 23.1

Even if we were to conclude that the 2nd SLC's report was somehow wrongful and that we could not dismiss the action pursuant to the business judgment rule, the two named plaintiffs would have to show that they are qualified to pursue the action derivatively under Federal Rule of Civil Procedure 23.1. Upon review of plaintiffs' depositions, we conclude that Caryn and Susan Mills do not meet the rule's requirements.

Rule 23.1 of the Federal Rules of Civil Procedure governs shareholder derivative actions and provides, *inter alia:*

> The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.

As one element of fair and adequate representation, a plaintiff must be a shareholder both at the time the suit is filed and throughout the pendency of the litigation. *Portnoy v. Kawecki Berylco Industries, Inc.,* 607 F.2d 765, 767 (7th Cir.1979); *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1295 (N.D.Ill.1981).[8] The deposition

---

**6.** The last three alleged defects in the LTGP as raised by plaintiffs are: (1) the possibility that one year performance periods could be established; (2) the fact that the LTGP permitted grants to be made every year, and (3) the absence of a "cap" on the value of performance units.

Insofar as this Court's prior opinion left open the question of whether the 1981 grant was "fair" in that the recipients benefitted from the 1980 restructuring of Esmark, we accept the thorough (and basically unchallenged) investigation and analysis presented by the 2nd SLC. *See* 2nd SLC's Report at 87–101.

**7.** Plaintiffs suggest in their briefs that because this Court referred to their securities law claim as having "a life of its own which must be evaluated on the merits," 544 F.Supp. at 1293, it is not subject to the business judgment rule. Such a contention misinterprets this Court's statement as well as the business judgment rule. The statement was intended to distinguish plaintiffs' federal claims (which, with one exception, were not presented to nor considered by the 1st

SLC) from plaintiffs' related state claims (which were considered by the 1st SLC). The statement was not meant to suggest that federal claims raised in a derivative action and rejected by a committee of independent directors may not be dismissed under the business judgment rule. *See, e.g., Maldonado v. Flynn,* 485 F.Supp. 274, 280 (S.D.N.Y.1980) (application of the business judgment rule does not contravene the purpose of § 14(a) of the Securities Exchange Act). Plaintiffs expressly brought their action derivatively and *not individually,* precluding any consideration of whether an individual action lies under the federal securities laws despite dismissal of the derivative action.

**8.** As the court explained in *Portnoy:*

> The underlying rationale [of requiring the shareholder to hold shares throughout the litigation] is that because a shareholder will receive at least an indirect benefit (in terms of increased shareholder equity) from any corporate recovery, he has an adequate interest in vigorously litigating the claim. A non-

of Caryn Mills reveals that although she held approximately 23 shares of Esmark stock when the suit was initiated in 1981, she sold all of her shares in October and November of 1982. Deposition of Caryn Mills at 5–6. Therefore, the suit may not be maintained as a derivative action with Caryn Mills as named plaintiff.

Susan Mills sold ten of her shares in March of 1982, retaining 13 shares of Esmark stock. Deposition of Susan Mills at 9. Although she cannot be disqualified as a non-shareholder, her minimal interest in the corporation leads us to inquire further into whether she could fairly and adequately represent Esmark's other shareholders in pursuing this litigation.

■ Whether a particular plaintiff will fairly and adequately represent the interest of other similarly situated shareholders as required by Rule 23.1 turns upon the total facts and circumstances of the case. *Rothenberg v. Security Management Co., Inc.,* 667 F.2d 958, 961 (11th Cir.1982). One factor to be considered is the degree of plaintiff's familiarity with the litigation and willingness to learn about the suit. *Id.; Davis v. Comed,* 619 F.2d 588, 592 (6th Cir.1980). The degree of control exercised by the attorneys over the litigation and the degree of personal commitment to the action on the part of the plaintiff are similarly to be considered. *Rothenberg,* 667 F.2d

at 961; *Cohen v. Bloch,* 507 F.Supp. 321, 325 (S.D.N.Y.1980); *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation,* 484 F.Supp. 253, 263 (W.D.Tex.1979).

In the deposition of Susan Mills, she demonstrates little, if any, comprehension of the litigation and indicates that total control as well as financing of the action rests with the lawyers. The action was initiated after her great-uncle (one of the original lawyers in the case) spoke with Susan's parents, who in turn informed Susan that there was "just cause" to sue Esmark. Deposition of Susan Mills at 20–21.[9] She does not recall discussing the case with any lawyers before her great-uncle sent her the original complaint for her signature. *Id.* at 23. She did not participate in the process of ascertaining who the defendants should be or what claims should be alleged. When asked to explain the basis of her belief in the truth of the complaint, she replied, "Just this [referring to the complaint as originally sent to her] and my trust in the lawyers." *Id.* at 43.[10]

■ At her deposition taken in November, 1982, Susan Mills had no recollection or knowledge of this Court's prior opinions and orders in her case, *id.* at 55; nor did she recall the proxy statement upon which her federal claims are based. *Id.* at 45. Aside from her great-uncle who died in the

shareholder or one who loses his shareholder interest during the course of the litigation may lose any incentive to pursue the litigation adequately.
607 F.2d at 767.

**9.** The deposition reads in relevant part:
Q. Well, do you remember whether they told you what you would be claiming against Esmark if you became a Plaintiff in a lawsuit?
A. What do you mean?
Q. Well, what would your claim be:
What would you say that Esmark did wrong, if anything?
A. That a lot—they received a lot of money—the big guys on top received a lot of money that wasn't necessarily theirs. It should have been spread out to the shareholders.
Q. That is how your parents understood it after talking to Lawrence Mills?
A. Somewhere close to that, I guess. I don't remember exactly.

**10.** This portion of the deposition reads as follows:
Q. What was the basis of your belief that the Complaint was true?
A. Just this and my trust in the lawyers.
Q. Your lawyers wouldn't have sent you a Complaint that wasn't true?
A. No.
Q. Is that your basis of your belief?
A. Yes.
Q. Did you ask your lawyers by telephone or letter or directly about any allegation in here?
This was at the time you signed the verification.
A. No.
Q. Did they explain any of it by telephone or—
A. No.
Q. —in person or writing at that time?
A. Possibly in writing, but I don't think so.

summer of 1982, Susan Mills never met nor spoke with any of her lawyers until immediately prior to her deposition. *Id.* at 55. The expenses of her deposition were paid by the lawyers, and her understanding of the arrangement was that the lawyers expected to be reimbursed "[b]y the settlement or whatever." *Id.* at 89. Moreover, Mills acknowledged that she has "not much of anything" to gain personally from successful prosecution of the suit. *Id.* at 64. Such a blatant lack of knowledge and commitment on the part of Susan Mills as well as total control over the case on the part of her lawyers lead us to conclude that she could not pursue this action as a fair and adequate representative of Esmark shareholders.

For the reasons stated above, defendants' motion for dismissal with prejudice or summary judgment is granted. It is so ordered.